741 F.2d 66
 John HARRINGTON, Alonzo Watts, Clifton Speight, William
Ryder, Ronney McBride, Ray Forbes, Robert (Bobby) Smith,
Ronald D. Carnes, Richard A. Carter, Bradford Mizell Lilley,
Donald W. Morgan, Franklin Strader, and John H. Russell, on
behalf of themselves and all others similarly situated, Appellants,
v.
James HOLSHOUSER, Governor, State of North Carolina, V. Lee
Bounds, Commissioner, North Carolina Department of
Corrections, Dr. Stanley Blackledge, Warden, Central Prison,
Franklin Mahan, Regional Superintendent, M.S. Lee, Captain,
Washington County, Unit 3560, Creswell, North Carolina, R.L.
Turner, Superintendent of Odom Correctional Institution of
the North Carolina Department of Correction, F.R. Moore,
Sergeant, Central Prison, Appellees.
 No. 83-6271.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 7, 1984.
Decided Aug. 14, 1984.
 
 Barry Nakell, Chapel Hill, N.C., for appellants.
 Jacob L. Safron, Sp. Deputy Atty. Gen., Raleigh, N.C. (Rufus L. Edmisten, Atty. Gen., Raleigh, N.C., on brief), for appellees.
 Before WINTER, Chief Judge, SPROUSE, Circuit Judge, and BUTZNER, Senior Circuit Judge.
 SPROUSE, Circuit Judge:
 
 
 1
 The controversy involved in this appeal is now before this court for the third time. The underlying issue is whether the state of North Carolina (State) has complied with the directions of the United States Supreme Court in Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), and of panels of this court in Smith v. Bounds, 538 F.2d 541 (4th Cir.1975) and Harrington v. Holshouser, 598 F.2d 614 (4th Cir.1979) (unpublished) (Harrington I). In accordance with the Supreme Court's holding in Bounds v. Smith, which affirmed our decision in Smith v. Bounds, the State was required to implement a plan it had devised for building a series of law libraries in its prison system for use by inmates challenging either the legality or conditions of their confinement. The State had devised its plan after a federal district court found that North Carolina prisoners were being denied their constitutional right of access to the courts by the State's failure to provide adequate legal resources to its inmate population. The State's plan was accepted by the district court, modified slightly by this court, and finally approved subject to our modifications by the United States Supreme Court in Bounds v. Smith. Two years after the Bounds decision, the State submitted certificates of compliance to the district court which had originally approved the plan, requesting that it dismiss the still-pending civil rights actions of the inmates who had successfully challenged the availability of legal resources to the State's prisoners. The district court granted the request, but a panel of this court reversed in Harrington I. The panel in that case held that, although the plan itself was not subject to attack, the State had the burden of proving that implementation of the plan met constitutional standards. It remanded the case to the district court for a determination of whether implementation of various aspects of the plan was constitutionally sufficient.
 
 
 2
 The case lingered in that posture in the district court from the time Harrington I was decided on May 14, 1979, until the district court again dismissed the action on April 18, 1983, finding the State to have implemented the plan successfully. Thus, seven years after the Supreme Court decision in Bounds v. Smith, the same legal action remains still unresolved on this appeal despite Harrington's efforts, through a series of petitions and motions, to ensure compliance with the Supreme Court's mandate.
 
 
 3
 Reduced to their essentials, Harrington's complaints are four. He contests (1) the adequacy of the training provided to prisoner paralegals staffing the law libraries; (2) copying charges assessed against prisoners unable to pay; (3) the permissibility of limiting access to the libraries for prisoners on disciplinary segregation; and (4) the State's plan to provide access to the libraries by means of short-term transfers for prisoners detained in prison units without libraries. Harrington's challenge to the adequacy of the transfer program rests largely on allegations of overcrowding and a resultant lack of available bed space to accommodate short-term transferees. Harrington has made extensive efforts through counsel since Harrington I was decided to obtain information. Although the State has been less than forthcoming in its responses, answers to several sets of interrogatories and testimony at a hearing on the subject of compliance present the following picture of the State's actions.
 
 
 4
 1. Training of prisoner paralegals.
 
 
 5
 By the end of 1980, the State had conducted one inmate paralegal training session, consisting of seven hours of instruction on elementary principles of criminal procedure, three-and-one-half hours of legal research technique training, and three-and-one-half hours of going over problems and answering questions. Only two of thirty-one prisoners staffing the libraries at that time had participated in that session; all others received on-the-job training. By September 1982, two legal workshops had been conducted. Of a total of thirty inmate paralegals then employed by the prison libraries, seven had participated in a workshop. In about September 1982, the State contracted with Durham Technical Institute to provide training for library staff and inmate paralegals. Under the Durham Tech agreement, the institute would hold three five-day-long workshops annually. The record on appeal, which contains no information on this subject after September 1982, does not indicate that any workshops have in fact been conducted for the State by Durham Tech, nor is there any current information on the number of inmate paralegals with workshop training as a percentage of those now staffing the prison libraries.
 
 
 6
 2. Use of copying machines.
 
 
 7
 The State has not provided any information about the availability or the use of copying facilities by prisoners, indigent or otherwise. It is impossible to assess, therefore, whether the State's policies in this area satisfy State obligations under the plan.
 
 
 8
 3. Library use by segregated inmates.
 
 
 9
 The State's regulations divide requests to use law libraries by inmates into two classes--those made by inmates with legal deadlines to meet (Category I) and without deadlines (Category II). Inmates subject to disciplinary segregation may use the libraries available only if they have made Category I requests. Category II requests are granted to inmates only after they are released from segregation. Inmates with Category II requests can be denied library access for fifteen days at most because under applicable prison regulations, inmates are entitled to a forty-eight hour release from segregation at the end of each fifteen-day period spent in segregation. 5 N.C.Admin.Code 2B.0205. The State views delays of this length as acceptable and has provided no alternative means of access to libraries for inmates with Category II requests during their segregation.
 
 
 10
 4. Bed space for inmates seeking transfers for library use.
 
 
 11
 In answer to the plaintiff's interrogatories, the State disclosed that most prison units with either full or smaller "core" law libraries were overcrowded during the period covered by the answers, February 1978 to September 1979. At the hearing before the district court, the Chief of Educational Services of the State Department of Correction, Jerry M. Price, indicated that requirements for bed space for inmates temporarily transferred to use libraries were always met. He testified:
 
 
 12
 [A]s far as inmates who want to use the library, we always make available to them bedspace. We have bedspace reserved for those people.
 
 
 13
 Price estimated that in the year from June 1981 to June 1982 over four hundred transfers of inmates to prisons with full libraries had been made, and over two hundred transfers of inmates to prisons with core libraries. The record on appeal does not contain information more current than June 1982. Although the record indicates that not all requests for library use were honored during this time period, it does not appear that shortage of available beds was the reason for the denial of any request.
 
 
 14
 The district court dismissed the actions in this and two other similar cases in April 1983 with a simple order, stating that "the North Carolina Department of Correction has in a constitutionally sufficient manner established a prison library system which provides meaningful access to legal materials to all inmates currently incarcerated within the North Carolina prison system," and directing the Clerk to dismiss these actions and remove them from the docket of that court.
 
 
 15
 Although the district court made no factual findings and did not discuss in any detail the manner in which the State has complied with the directions of the Supreme Court, we agree after a review of the testimony and other information contained in the record that the portion of the State's implementation relating to access by inmates in disciplinary segregation is constitutionally sufficient. In addition, implementation of the plan to transport inmates from prisons without library facilities to installations having the required library is also adequate. True, the State's prisons, like many throughout the country, are crowded, but the evidence was clear and unchallenged that by whatever means necessary overnight facilities were made available for inmates temporarily requiring them in connection with the library access program.
 
 
 16
 The availability of copying machines is a different matter. In Harrington I we required, among other things, that the State prove that it had provided access to copying machines free of charge to indigent inmates. The State has yet to establish the nature of those copying facilities in sufficient detail to allow this court to determine whether the State is in compliance with this part of our direction to it.
 
 
 17
 A more important deficiency in the State's efforts toward implementation is its apparent lack of a program to train prisoner paralegals to assist inmates in the use of the library. Again, the district court made no finding of fact concerning this important aspect of the library program, but it is clear from the evidentiary record that the State's efforts to comply with the court's directions in this regard have had very little effect. Chief of Educational Services Price testified that there were approximately thirty paralegals in the State's prison system as of September 1982. The number at each library varies, of course, depending upon the size of the library, but Price admitted that in many of the libraries none of the inmates assigned to library work had received any kind of formal training. The State, through its witnesses, admitted that it had been unable to implement the training plan its officials originally considered necessary to provide realistic access to the libraries by its inmates.
 
 
 18
 The plan approved by the Supreme Court visualized inmates assigned to work in the libraries on a regular basis and "trained to the best extent possible" in legal research and assisting other inmates with research as an important component of the plan. A description of the State's efforts in this area since then is a chronology of failure. After several years of apparent inaction, the State conducted a single training session for paralegals in 1980; only two of thirty-one inmates staffing the library at that time had participated in that session. Two years later, only one more training session had been conducted for the State, this one by a professor of law at the University of North Carolina. After an unsuccessful attempt to find professionals at North Carolina Central University, Meredeth College, and Campbell University to conduct the workshops, the State reported on October 1, 1982, that it had contracted with Durham Technical Institute to provide three five-day workshops annually. As we have observed earlier, the record before this court contains no indication that this proposed training program has even been undertaken, let alone been successful.
 
 
 19
 Harrington reviews in this appeal nearly a decade of unsuccessful efforts by the State to implement the plan fully and urges that at this juncture the only way that the State constitutionally can afford library access to its inmates is by employing the services of a legal services plan, such as the North Carolina Prisoner Legal Services, Inc., with which counsel for Harrington has been associated since its inception in 1978. We cannot agree with that thesis, which Harrington repeatedly urges, but note, as did the Supreme Court in Bounds, that providing the assistance of trained lawyers in conjunction with physical library facilities is one way to assure constitutionally acceptable access to libraries by inmates.
 
 
 20
 It may well be that the State has, by now, a training program enabling trained prisoner paralegals effectively to assist inmates in the use of the prison libraries. It is possible that inmates who are indigent are able to make needed copies free of charge. We are unable to determine that from the present record. It is necessary, then, that we again remand this case to the district court with instructions to make appropriate findings of fact concerning the training of prisoner paralegals and the availability of copying facilities to indigent inmates.
 
 
 21
 Furthermore, the state's answers to interrogatories disclose that only 76 percent of the inmates requesting library use at Central Prison, and 64 percent of those requesting use at Polk Youth Center, were scheduled for use. Consequently, the district court should make findings concerning requests that were not scheduled and determine whether they were justifiably denied. In this connection, the state should furnish evidence to the court regarding the typical number of hours in a day and the number of days in a week or month that inmates were allowed to spend in the library.
 
 
 22
 The district court should also make inquiry about any other matter drawn to its attention by the parties or that it deems appropriate. From its findings of fact and legal conclusions, it should determine whether the state has established a prison library system in a constitutionally sufficient manner.
 
 
 23
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.