**UNITED STATES of America, ex rel. PARA–PROFESSIONAL LAW CLINIC, et al.**

v.

**Robert P. KANE, et al.**

**Civ. A. No. 78–538.**

United States District Court, E.D. Pennsylvania.

March 25, 1987.

Roy Williams a/k/a Ahmad Abdul Jabbar-al Samad and Hugh Williams, Zebbie Clifton and Bebley Wells, pro se.

Maria Parisi Vickers, Sr. Deputy Atty. Gen., Philadelphia, Pa., for Robert P. Kane, et al.

## OPINION

JOSEPH S. LORD, III, Senior District Judge.

### Background

On or about January 27, 1976, inmates at the State Correctional Institute at Grater-ford ("Graterford") formed the Para-Professional Law Clinic ("PPLC" or "Clinic") to provide legal assistance to Graterford inmates. In December 1977 the prison announced plans to close PPLC. Certain inmates moved for a preliminary injunction. After a two day hearing I found that closing PPLC violated inmates' rights to obtain legal assistance from other inmates and, in the absence of an adequate law library, inmates' rights of access to the courts. I ordered that the Clinic be reopened. *Wade v. Kane*, 448 F.Supp. 678 (E.D.Pa.1978). The Third Circuit affirmed. *Wade v. Kane*, 591 F.2d 1338 (3d Cir.1979).

After I issued the preliminary injunction in *Wade*, another group of inmates filed a complaint, *Para-Professional Law Clinic v. Kane*, C.A. No. 78–538, raising the same issues addressed in *Wade*. These two actions were consolidated.

After settlement negotiations proved unsuccessful, a final hearing was held. None of the *Wade* plaintiffs remained incarcerated at Graterford, and that action was dismissed with prejudice. I therefore have before me only C.A. No. 78–538. However, since this case and the *Wade* case were consolidated and would unquestionably have been tried together as one case, I considered the evidence presented in both cases rather than engage in the duplicative and unnecessary process of re-presenting all the evidence taken in *Wade*. After careful review of the evidence presented at the original and final hearings, I make the following findings of fact and conclusions of law.

### Findings of Fact

1. Graterford provides inmates an institution-run law library ("library"). At the time of the final hearing, the library contained up-to-date collections of United States Supreme Court Reports, Federal Reporter, Federal Supplement, Pennsylvania Reporter (Atlantic Reporter, Second Series), selected federal and state statutes and Shepard's Federal Citations. The library

also contained numerous research and reference aids.[1]

2. The library is open Monday thru Friday from 8:30 a.m. to approximately 11:20 a.m., 1:00 p.m. to approximately 3:20 p.m., and 6:30 p.m. to 8:30 p.m.

3. The library occupies approximately 700 square feet and can accommodate approximately twenty inmates. If more than twenty inmates wish to use the law library at any one time, they may work in the adjacent general library. The general library is open Monday thru Friday, from 8:30 a.m. to approximately 11:20 a.m., and 1:00 p.m. to approximately 3:20 p.m.

4. The library employs six or seven inmates as legal reference aides ("aides").

5. All aides are scheduled to work at all times the library is open. However, on average only two or three aides are present at any particular time. At various times the library has employed a Spanish-speaking aide.

6. Aides (but not Clinic members) are not permitted to give inmates legal assistance or advice during working hours, since this might diminish the number of inmates able to enlist the primary purpose of the aides, to locate citations and law books. Aides are permitted to assist inmates only by locating library materials and showing inmates how to use such materials.

7. Library aides are not required to have training in legal research; the only job qualification is an interest in working in the library. One aide has completed a state-sponsored workshop on legal research. There is no evidence that any other aides have received training in legal research.

8. Generally, there are no problems resulting from noise or overcrowding in the library. There is no evidence as to whether the library would be overburdened if PPLC is closed.

9. The library is located away from inmate cells. Generally, inmates must apply to their cell block officer for a pass to obtain access to the library.

10. Inmates housed in the Classification Center must obtain a pass from the librarian to obtain access to the library.

11. There is no evidence of a system whereby inmates who wish to confer concerning legal problems can gain access to the library at the same time. There is no regulation prohibiting inmates who wish to confer concerning legal problems from attempting to obtain library passes for the same time. There is evidence that passes are not always honored. As a practical matter, it is difficult for inmates to arrange to meet in the library to confer about legal problems.

12. Inmates placed in administrative or disciplinary custody are housed in the Restricted Housing Unit ("RHU") or in E Gallery. There are approximately forty inmates housed in RHU and approximately 120 inmates housed in E Gallery. These inmates are not authorized to leave their housing units and are unable to obtain passes for the library.

13. Inmates on RHU or E Gallery may submit a request slip for a case or book, or legal topic they wish to have researched. Aides perform requested research. One or two days after receiving a request slip, the library will provide three or four books or cases.

14. The library provides a pencil and few sheets of paper upon request.

15. The library contains no Spanish-language legal reference materials.

16. Graterford inmates take placement tests in reading, spelling and arithmetic. A study completed several years ago found that Graterford inmates scored at the 7.3 grade level on these tests. A more recent study found that the average reading level was at the 6.4 grade level.

17. A report completed several years ago estimated that approximately 23% of

---

1. The library contains, *inter alia*, digests of state and federal law; legal dictionaries; L. Yackle, *Post Conviction Remedies*; J. Cook, *Constitutional Rights of the Accused*; E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions*; W. Patton, *Criminal Trial Manual for Pennsylvania*; C. McCormick, *McCormick's Handbook of the Law of Evidence*; and portions of *Moore's Federal Practice*.

Graterford inmates read at a "pre-functional" level. The Director of Treatment estimates that 300 to 325 Graterford inmates are functionally illiterate.

18. A handbook produced by the inmate-run Prison Literacy Project states that the Graterford education department estimates that 1400 of 2400 Graterford inmates are functionally illiterate.

19. A Clinic member estimated that, in 1978, 30 to 50% of Graterford inmates were functionally illiterate.

20. Approximately one-third of the 168 Hispanic inmates at Graterford can understand, read and write English. Spanish-speaking inmates who cannot read or write English need assistance to utilize library materials.

21. Graterford offers a variety of educational programs, including an adult basic education program leading to a high school equivalency diploma, a computer literacy course, and a tutoring program in English as a second language.

22. Prison counselors are available to help illiterate inmates contact attorneys and courts. A Spanish-speaking counselor is available to assist Hispanic inmates. Counselors are not qualified to give legal advice to inmates.

23. PPLC is a non-profit corporation formed under Pennsylvania law for the purpose of providing legal services to Graterford inmates.

24. PPLC presently maintains an office on each cell block, *i.e.*, cell blocks A, B, C, D and E. The Clinic also has an office off the main corridor ("main office") which is approximately as large as two cells and an office/library of approximately 700 square feet located in the prison school building.

25. Inmates do not need a pass to visit the Clinic office on their cell block. Inmates have access to the Clinic office on their cell block at any time the office is open.

26. Clinic cell block offices are open from 8:00 a.m. to 11:20 a.m., 1:00 p.m. to 3:20 p.m., and 6:00 p.m. to 8:45 p.m.

27. The Clinic's main office and office/library are accessible on a limited basis to blocks A, B, C and D inmates.

28. The Clinic office on cell block E provides legal assistance to inmates in administrative and disciplinary custody. Clinic members obtain special passes to enter cell block E.

29. Clinic members perform legal services for other Graterford inmates. There are approximately sixteen to twenty Clinic members.

30. Clinic members represent inmates in Post-Conviction Hearing Act cases, motions for new trial, direct appeals, motions in arrest of judgment, habeas corpus petitions, civil rights actions, misconduct hearings and other actions affecting inmates' welfare. Clinic members also help inmates prepare letters to courts and outside counsel, and explain communications to inmates from courts and outside counsel.

31. In 1984 PPLC produced 172 notices of appeal, 984 writs, motions and petitions, 78 letters to judges, 191 letters to attorneys, 113 letters to clerks of court, and 90 miscellaneous letters.

32. Clinic members often work in excess of twelve hours per day on behalf of inmates.

33. On numerous occasions, Clinic members have provided both adequate and successful legal representation for Graterford inmates.

34. In 1978, a Clinic member testified that 80% of the clients he serviced over a four year period were unable to read and comprehend legal reference materials.

35. Within a six month period, all of the Hispanics unable to understand English are referred at one time or another to the Clinic.

36. PPLC by-laws prohibit members from receiving compensation from inmates for services rendered. Graterford pays between $520 and $820 per month in salary to members of the Clinic.

37. PPLC services many inmates unable to obtain court appointed counsel. Inmates are generally unable to obtain court appointed counsel to ascertain whether they

have claims upon which relief can be granted.

38. By representing inmates at very low compensation from Graterford and without fee from inmates, the Clinic enables courts to avoid incurring the expense of appointing counsel in many cases.

39. Prison regulations do not permit more than one client inside a cell block office at any one time. Therefore, the cell block offices provide private areas conducive to confidential legal communications.

40. PPLC's main office may be used for confidential legal discussions.

41. PPLC's office/library in the school building does not afford the privacy necessary for confidential legal discussions.

42. Up to five pairs of inmates can hold confidential legal discussions in the law library. In addition, several pairs of inmates could hold confidential legal discussions in the general library.

43. Prisoners may do legal work in their cells. However, prisoners are not permitted inside another inmate's cell. Therefore, inmate cells may not be used for confidential legal discussions.

44. Although inmates are not prohibited from assisting each other in legal matters, due to the noise level and traffic interruptions, the block recreation facilities are unsuitable for confidential legal discussions.

45. If the Clinic is closed and members are assigned to other full time jobs, it is unlikely that they will have the time or the energy to perform legal services for other inmates.

46. There are approximately 25 to 30 well known jailhouse lawyers who are not Clinic members.

47. There is no evidence of a system, other than the Clinic, whereby inmates who require legal assistance and inmates who are willing and able to provide legal assistance can officially make their presence known to one another.

48. Other than the library and research aides, Graterford provides no legal services or assistance to inmates.

49. Graterford's inmate capacity is 2100. At the time of the final hearing, Graterford's inmate population exceeded 2500.

50. Prison overcrowding has led to double celling. Double celling presents security concerns and administrative problems.

51. Due to prison overcrowding, an area off the main corridor has been converted into a dormitory.

52. A number of cells are presently used for storage.

53. PPLC's main office and office/library are not suitable for housing inmates. Closing all PPLC block offices would provide housing space for 5 to 10 inmates.

54. Increased inmate population has led to increased inmate movement through the institution and difficulty in monitoring such movement. Contraband is passed from one cell block to another as inmates travel through the main corridor.

55. Clinic members add to general inmate movement by travelling to various Clinic offices. There is no evidence that PPLC members have abused their privileges to move within the prison.

56. Due to space limitations, the prison cannot adequately store and safeguard inmate property.

57. If the Clinic is closed, the prison intends to use PPLC's main office as a storage area for inmate property.

*Discussion*

■ At the time I issued the preliminary injunction, Graterford's library did not contain current volumes of United States Supreme Court Reports, Federal Reporter, Atlantic Reporter, or copies of §§ 2254 and 2255 of Title 28 of the United States Code (and annotations thereto), the Federal Rules of Criminal Procedure, the Federal Rules of Civil Procedure, and various other indispensable legal research material. I had no difficulty finding that the library was inadequate to preserve inmates' constitutional rights. *Wade,* 448 F.Supp. at 684. The library has been substantially upgraded and is no longer constitutionally inadequate because of a lack of legal material.

■ However, the right at issue is not the right to an adequate law library, but rather the "fundamental constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). "The central question in evaluating whether a law library adequately provides meaningful access to the courts is whether the facility will enable the prisoners to fairly present their complaints to a district court." *Cody v. Hillard,* 599 F.Supp. 1025, 1060 (D.S.D. 1984) (quoting *Cruz v. Hauck,* 627 F.2d 710, 720 (5th Cir.1980)). As the library is unavailable to prisoners in administrative or disciplinary custody, and is useless to those who are functionally illiterate, the library, by itself, is totally ineffectual to preserve the fundamental right of access to the courts of these prisoners.

### A. Inmates in Administrative and Disciplinary Custody

Prison regulations deny physical access to the library to the approximately 160 inmates in administrative or disciplinary custody. The prison's program of providing a small number of cases or books upon request does not satisfy the constitutional obligations set forth in *Bounds.*

Legitimate security considerations may justify restrictions on direct access to the library. *See Campbell v. Miller,* 787 F.2d 217 (7th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986). However, "[s]imply providing a prisoner with books in his cell, if he requests them, gives the prisoner no meaningful chance to explore the legal remedies he might have." *Williams v. Leeke,* 584 F.2d 1336, 1339 (4th Cir.1978) (Haynsworth, C.J.), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979). Accord, *Cruz, supra; Canterino v. Wilson,* 562 F.Supp. 106, 110 (W.D.Ky. 1983). This is so for several reasons. First, it is simply "unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult." *Williams,* 584 F.2d at 1339. Second, prison "[r]estrictions on the amount of legal material[ ] ... limit[s] the usefulness of research outside the library." *Cepulonis v. Fair,* 732 F.2d 1, 4–5 (1st Cir.1984). Legal research often involves a painstaking study of a series of cases. *Bounds* suggested that, before filing a pleading, a prisoner would have to research "jurisdiction, venue, standing, exhaustion of remedies, proper parties plaintiff and defendant and types of relief available," as well as substantive law. *Bounds,* 430 U.S. at 825, 97 S.Ct. at 1496. Every judge and lawyer knows that, as a practical matter, it would be impossible to research adequately an action when access is limited to three or four books produced on one or two days notice.

There is no evidence that other prisoners may only use three or four law books at one time. Thus, the prison regulations violate Graterford's duty to insure that the "opportunity to do legal research [afforded those in administrative or disciplinary custody] must be at least the equivalent of the opportunity that is available to an inmate who is permitted to go personally to the prison law library." *Wojtczak v. Cuyler,* 480 F.Supp. 1288, 1301 (E.D.Pa.1979). *See also Smith v. Bounds,* 610 F.Supp. 597, 602 (E.D.N.C.1985) (inmates confined to disciplinary segregation must have the same access to law library as other inmates). These restrictions are not alleviated by the existence of jailhouse lawyers, or the assistance of research aides or prison counselors. There is no evidence that inmates in administrative or disciplinary segregation have access to jailhouse lawyers. Assuming *arguendo* that these inmates could meet with jailhouse lawyers, there is no area in which they could engage in confidential legal discussions. Finally, there is no evidence that self-appointed jailhouse attorneys provide adequate legal assistance.

Only one of the legal research aides has completed a course in legal research. An untrained legal research staff is insufficient to safeguard inmates' rights of access to the courts. Although prison counselors may contact courts or attorneys on an inmate's behalf, they are not trained to do legal research or writing. Thus, they cannot compensate for a lack of access to the library.

There is no allegation or evidence that the legal research and services provided by Clinic members to inmates in administrative or disciplinary custody is inadequate. In the absence of other prison programs, eliminating the Clinic would leave those in administrative or disciplinary custody with inadequate access to the library and the courts, in violation of these inmates' fundamental constitutional rights.

### B. Functionally Illiterate Inmates

Courts have consistently held that the mere provision of an adequate law library does not necessarily satisfy the constitutional obligation set forth in *Bounds*. An adequate law library, by itself, cannot provide meaningful access to the courts for those inmates unable to read and understand library materials. *See, e.g., Cruz,* 627 F.2d 710, 721 ("Library books, even if 'adequate' in number, cannot provide access to the courts for those persons who do not speak English or who are illiterate"); *Cody,* 599 F.Supp. at 1061 ("a law library, without more, is not sufficient to enable prison inmates ... unschooled in the basics of legal writing to prepare a petition or complaint") (citation omitted); *Glover v. Johnson,* 478 F.Supp. 1075, 1096 (E.D. Mich.1979) (an adequate library "cannot provide meaningful aid to a prisoner unschooled in the most basic techniques of legal research"); *Canterino,* 562 F.Supp. at 108–112 (mere access to an adequate legal library is unavailing to prisoners lacking sufficient intellectual ability to use the facility).[2]

Defendants' contention that "law libraries alone will adequately satisfy the right to access to the courts" rests upon passages in *Bounds* stating that prisons must provide "prisoners with adequate law libraries *or* adequate assistance from persons trained in the law," *Bounds,* 430 U.S. at 828, 97 S.Ct. at 1498 (emphasis added) and that "adequate law libraries are one constitutionally acceptable method to assure meaningful access to the courts." *Id.* at 830. *Bounds* reviewed a case decided on summary judgment, without the benefit of an evidentiary hearing. Thus, although the Supreme Court rejected the argument that inmates in general are "ill equipped to use" law libraries, *id.* at 826, there is no indication that the *Bounds* record included evidence regarding inmate illiteracy. *See also Smith v. Bounds,* 538 F.2d 541 (4th Cir.1975) (no discussion of inmate illiteracy).[3] *DuPont v. Saunders,* 800 F.2d 8 (1st Cir.1986) and *Cepulonis v. Fair, supra,* relied upon by defendants, do not address the question of whether an adequate law library provides functionally illiterate inmates with meaningful access to the courts. Similarly, in *Campbell, supra,* there was no allegation that the appellant lacked the capacity to utilize the prison's law library.

In *Hooks v. Wainwright,* 536 F.Supp. 1330 (M.D.Fla.1982), the court found that more than fifty percent of Florida's inmate population was functionally illiterate. Senior District Judge Scott concluded that no plan utilizing libraries alone could assure meaningful access to the courts, and ordered defendants to provide "assistance of counsel, in some form." *Id.* at 1349. The Eleventh Circuit reversed, declaring that *Bounds* does not require states to provide legal counsel to inmates. *Hooks v. Wain-*

---

**2.** As one court pointedly observed:

[A]ccess to the fullest law library anywhere is a useless and meaningless gesture [for] the great mass of prisoners.... To expect untrained laymen to work with extremely unfamiliar books, whose content they cannot understand, may be worthy of Lewis Carroll, but hardly satisfies the substance of the constitutional duty.

Access to full law libraries makes about as much sense as furnishing medical services through books like: "Brain Surgery Self-Taught" ... along with scalpels, drills, hemostats, sponges and sutures.

*Falzerano v. Collier,* 535 F.Supp. 800, 803 (D.N.J. 1982).

**3.** In a later proceeding, the court found that the illiteracy rate of North Carolina inmates was extremely high. *Smith v. Bounds,* 610 F.Supp. 597, 604 (E.D.N.C.1985). This was one of several factors that led the court to find that defendants' library system did not provide adequate access to the courts. Senior District Judge Dupree ordered defendants to provide inmates with assistance of counsel.

*wright,* 775 F.2d 1433 (11th Cir.1985). However, the appellate court recognized that providing inmates "access to libraries in prison, or access to people who have access to libraries," as I do here, is "a far cry from constitutionally requiring the state to provide legal counsel for the imprisoned." *Id.* at 1437. Thus, *Hooks* does not stand for the proposition that an adequate law library provides functionally illiterate inmates with meaningful access to the courts. It merely does not, as I do not here, require counsel as the only meaningful alternative.

It is difficult to determine the precise number of illiterate or functionally illiterate prisoners at Graterford. Evidence was presented on the number of illiterates, the number of functional illiterates, the percentage of prisoners who read at a "pre-functional" level, and the percentage of Clinic clients unable to comprehend legal materials. In most cases the operative terms remained undefined. For purposes of the constitutional right of access to the courts, functional literacy should not be measured in terms of a particular reading level. Rather, functional literacy, for these purposes, means that an inmate can, "with reasonable adequacy," fairly present his complaint to the courts. *Johnson v. Avery,* 393 U.S. 483, 489, 89 S.Ct. 747, 750, 21 L.Ed.2d 718 (1969). *See also Cruz,* 627 F.2d at 720. Surely, all those considered illiterate or who read at a "pre-functional" level are unable to present fairly a complaint or petition to the courts without assistance. Similarly, Spanish-speaking inmates who cannot read or write English are unable to present, with reasonable adequacy, complaints to the courts without assistance. The evidence establishes that a substantial percentage of Graterford inmates are not functionally literate. This evidence merely confirms the Third Circuit's commonsense observation "of the fact that many prisoners are unable to prepare legal materials and file suits with-

out assistance." *Rhodes v. Robinson,* 612 F.2d 766, 769 (3d Cir.1979) (Seitz, C.J.).

It is also difficult to determine accurately the percentage of PPLC work done on behalf of functionally illiterate inmates. A Clinic executive was unable to estimate this figure at the March 1985 hearing. In 1978, a PPLC member testified that 80% of his clients were not functionally literate. Within any particular six month period, all the Hispanics who cannot read and understand English are referred to PPLC. The evidence establishes that a substantial percentage of PPLC's work is done for inmates who are not functionally literate.

The legal research aides and educational programs Graterford provides are insufficient to insure that functionally illiterate inmates have meaningful access to the courts. The library staff includes only one trained research aide, and although all aides are supposed to be in the library during working hours, typically at least half the aides are not present. In addition, it appears that only rarely is a Spanish-speaking aide present. Finally, aides are prohibited from providing legal advice to inmates during working hours.[4]

The prison is to be commended for providing a variety of educational programs. However, effectively denying a functionally illiterate inmate meaningful access to the courts until he completes a remedial education program is simply not acceptable. Finally, although inmates are not prohibited from conferring with non-Clinic jailhouse lawyers, there is no evidence regarding the competency of jailhouse lawyers or the ease of meeting and holding confidential legal discussions with them. Although I specifically ordered the presentation of evidence regarding the existence of a system whereby inmates who require legal assistance and inmates who are willing and able to provide legal assistance can officially make their presence known to one

---

**4.** For these reasons, the instant case is distinguishable from *Lindquist v. Idaho State Board of Corrections,* 776 F.2d 851 (9th Cir.1985). In *Lindquist,* inmate law clerks received training in legal research and writing skills. The clerks viewed two 45 minute video cassette tapes and

completed a training program led by an attorney. The court took judicial notice of the fact that the clerks "do an excellent job." *Id.* at 857. In addition, it does not appear that the clerks in *Lindquist* were prohibited from giving legal advice or writing assistance to inmates.

another, defendants presented no evidence of any such system. Thus, there is no evidence that, if PPLC is closed, functionally illiterate inmates will have "alternative and readily available means of obtaining assistance of at least equal caliber." *Bryan v. Werner,* 516 F.2d 233, 237 (3d Cir.1975). Relying on the prison grapevine to identify jailhouse lawyers is not sufficient to protect prisoners' constitutional rights. For this reason, the rights of functionally illiterate prisoners would be violated if PPLC is eliminated.

### C. Security Concerns

■ Defendants presented evidence that PPLC's use of seven different areas exacerbates security and space problems in the prison. Generally, courts should afford great deference to prison officials in matters concerning the security and administration of prisons. However, prison officials may not restrict the scope of inmates' constitutional rights by making automatic and conclusory assertions of discipline and security in the support of restrictive policies. *Cleavinger v. Saxner,* 474 U.S. 193, 106 S.Ct. 496, 504, 88 L.Ed.2d 507 (1985).

■ The link between problems caused by overcrowding and PPLC's use of prison space is tenuous at best. Graterford's population exceeds capacity by some 400 inmates. I do not underestimate the serious problems this causes prison administrators. However, the main office and office/library are not suitable for housing inmates. The office on E block provides the only space to hold confidential legal discussions for those in administrative or disciplinary custody. Closing the clinic offices on blocks A, B, C and D would provide housing for between 4 and 8 prisoners. However, the constitutional rights of inmates are not to be impaired because the State fails in its duty to provide adequate housing. Thus, the lack of adequate prison housing does not present a justification for closing PPLC.

Defendants presented evidence that the increase in traffic along the main corridor presents security concerns and that Clinic members travel to Clinic offices via the main corridor. With a prison population in excess of 2,500, I reject the notion that the sixteen to twenty Clinic members add significantly to the amount of traffic in the main corridor. Graterford's superintendent testified that even if the preliminary injunction is lifted, he would not close PPLC's office/library. If the cell block offices are closed, then the only remaining places inmates could hold confidential legal discussions with a Clinic member would be in the library, general library, or PPLC's main office. Inmates necessarily use the main corridor to reach any of these places. Thus, closing the block offices, while keeping the main office open, would result in increased inmate movement in the main corridor.

Finally, the prison lacks adequate space to store and safeguard inmate property. Defendants would like to use PPLC's main office as a storage area. Although inadequate storage space is not an insignificant problem, it cannot justify restriction of the fundamental constitutional right of access to the courts. For these reasons, security and space concerns do not justify the closing of any of PPLC's offices.

### D. Relief

The final issue to be addressed is whether closing any of PPLC's offices will violate inmates' fundamental constitutional right of access to the courts. Defendants have represented that, even if the injunction is lifted, they have no plans to shut down the cell block E office or the office/library. However, defendants would eliminate the offices on cell blocks A, B, C and D and the main office. Evidence at the initial hearing established that closing the block offices would overburden the main office. There is no evidence that PPLC could provide adequate services without the use of its main office or that "reasonable alternatives for obtaining assistance" would be available. *Bryan,* 516 F.2d at 237.

Defendants have not questioned whether plaintiffs have suffered an actual injury, or an "instance in which an inmate was actually denied access to the courts." *Hudson*

*v. Robinson,* 678 F.2d 462, 466 (3d Cir.1982) (quoting *Kershner v. Mazurkiewicz,* 670 F.2d 440, 444 (3d Cir.1982)). After the *Wade* hearing, I found that closing the Clinic "has caused the plaintiffs and those who benefit from the services of Clinic members to suffer irreparable harm." *Wade,* 448 F.Supp. at 683. There has been no showing that inmates have been denied access to the courts since entry of the preliminary injunction. Assuming that the preliminary injunction served its purpose—to prevent irreparable injury to plaintiffs *pendente lite*—such a showing is impossible.

I refuse to lift the injunction and wait for another inmate to be denied access to the courts. To wait for an inmate with a valid habeas corpus or civil rights claim to be denied access to the courts is intolerable; based on my findings in *Wade* and above, such an injury is inevitable.

For the foregoing reasons, to allow defendants to close PPLC would violate the prison's "affirmative obligation[ ] to assure *all* prisoners *meaningful* access to the courts." *Bounds,* 430 U.S. at 824, 97 S.Ct. at 1496 (emphasis added).

*Conclusions of Law*

1. This court has jurisdiction over the subject matter and parties in this case.

2. Because the Clinic gives legal advice and provides legal representation to functionally illiterate inmates, and inmates in administrative and disciplinary custody, it has standing to assert the constitutional right of access to the courts of these inmates.

3. Closing the Clinic would violate the constitutional rights of certain Clinic clients, including functionally illiterate clients and those housed in administrative or disciplinary custody, in violation of 42 U.S.C. § 1983.

4. Defendants have failed to provide any justification sufficient to warrant the violations of constitutional rights that would result from closing PPLC.

5. Plaintiffs are entitled to permanent injunctive relief.