**Debro Siddiq ABDUL–AKBAR, Plaintiff,**

v.

**Robert J. WATSON, et al., Defendants.**

**Civ. A. No. 89–22–JRR.**

United States District Court, D. Delaware.

Oct. 7, 1991.

Brian J. Bartley of Sullivan & Bartley, Wilmington, Del., for plaintiff.

David A. White and Gregory M. Sleet, Deputy Attys. Gen. of State of Del., Wilmington, Del., for defendants.

OPINION

ROTH, Circuit Judge.*

Debro Siddiq Abdul–Akbar, an inmate at the Delaware Correctional Center ("DCC"), filed this action pursuant to 42 U.S.C. § 1983 (1988) challenging the constitutional adequacy of legal services provided to inmates in DCC's Maximum Security Unit ("MSU"). Plaintiff was incarcerated in MSU for approximately three and one-half years, and alleges that during this period, prison officials did not fulfill their constitutional obligations under *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), to provide MSU inmates with adequate law libraries or assistance from legally trained persons. We conducted a bench trial in this action on July 16–18, 1991, and now, following post-trial briefing, issue our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I. PROCEDURAL HISTORY

Plaintiff commenced this action in January, 1989, by filing a *pro se* complaint against prison officials Robert J. Watson, Walter W. Redman, Hank Risley, Bruce Hobler, and Donald Davis, as well as Magistrate Judge Sue L. Robinson and the Delaware Department of Corrections. The claim against Magistrate Judge Robinson was dismissed by Memorandum Opinion and Order of January 25, 1989 on grounds of judicial immunity. By a separate Order of January 25, 1989, this action was then referred to the Magistrate Judge for handling, pursuant to 28 U.S.C. § 636 (1988). Service was completed on the remaining defendants in June, 1989.

█ Because a state is not a person within the meaning of 42 U.S.C. § 1983 (1988), *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989), and consequently cannot be sued under that statute for either damages or injunctive relief, *see id.* 109 S.Ct. at 2311 n. 10, we also dismissed plaintiff's claim against the Department of

---

* At the time of the bench trial in this action, Judge Roth was a District Judge for the United States District Court for the District of Delaware. She presently serves on the United States Court of Appeals for the Third Circuit.

Corrections by Order of November 16, 1990, adopting the Magistrate's Report and Recommendation of October 19, 1990 (Docket Item 112). However, by Order of April 15, 1991, we denied the summary judgment motion of the defendant prison officials, and ordered that this case proceed to trial.

In June, 1991, plaintiff secured the *pro bono* services of an attorney, Brian Bartley, who entered an appearance on plaintiff's behalf. We commend Mr. Bartley for his efforts in organizing and streamlining the presentation of evidence at trial. At the commencement of trial, counsel for the parties entered a stipulation dismissing Donald Davis as a defendant. The three day bench trial took place on July 16–18, 1991. The first two days of trial were held at the Delaware Correctional Center in Smyrna, Delaware, where we had the opportunity to view and inspect the library facilities provided for inmates' use.

At trial, plaintiff presented his own testimony as well as that of five other inmates who have resided in MSU; three inmates who have worked for the DCC library; Francene M. Kobus, the Inmate Legal Services Administrator for the Delaware Department of Corrections; and Neilsen C. Himelein, an attorney who has represented a class of inmates in a suit in the Delaware Court of Chancery. The defendants also relied on Ms. Kobus's testimony and further presented the testimony of Richard Hubbard, a Deputy Attorney General for the State of Delaware who was assigned to represent the Department of Corrections from February, 1987, until July, 1988; Defendant Henry Risley; and Major Barry Hawlk, the Security Superintendent at DCC. In addition, both sides introduced numerous documentary exhibits.

## II. FINDINGS OF FACT

Plaintiff was incarcerated in MSU from July 1, 1987, through February 1, 1991. He was convicted in the Superior Court of New Castle County, Delaware, of misdemeanor theft, reckless endangering, shoplifting, and third degree burglary, and has been serving an eight-year term of imprisonment at DCC since March, 1986. In February, 1991, plaintiff was transferred to medium security, where he remained through the time of trial in this action.

During the period in which plaintiff was housed in MSU, defendant Robert Watson was the Commissioner of the Department of Corrections of the State of Delaware. His duties as Commissioner have been to oversee all aspects of the operations of the Department of Corrections. DX 67, ¶ 2(B). Also during this time, defendant Henry Risley was the Bureau Chief of the Bureau of Prisons of the Department of Corrections, charged with overseeing all aspects of the operation of the prisons in the Delaware correctional system, and defendant Walter Redman was the Warden of the DCC prison. Finally, at all times relevant to this suit, defendant Bruce Hobler was the Education Director for the Delaware Department of Corrections. His duties as Education Director have been to supervise the operation of all law libraries in the prison system and the provision of legal and paralegal assistance to inmates.

The Maximum Security Building containing MSU was constructed eight or nine years ago. It is a separate facility, located outside the fence surrounding all other buildings of DCC. Inmates are typically transferred to MSU by the Institution Classification Division, Tr. at C–91, generally due to their poor institutional behavior. Tr. at C–95. Throughout the period from July, 1987, until January, 1991, the total population of DCC ranged from 1284 to 1618. DX 7. At full capacity, MSU may house sixty-four of these inmates, all in single cells. Tr. at C–90.

### A. *Legal Resources and Services Provided*

On a day-to-day management basis, the Delaware Department of Corrections' library system is run by Francene M. Kobus, the Inmate Legal Services Administrator for the department. Ms. Kobus has held this position for most of the period relevant to this suit, although she left during the year 1987 and so was not present for the first six months of plaintiff's incarceration

in MSU. Tr. at B–5. As indicated in her position classification form, she is responsible for selection and supervision of law library staff, planning and development for the law libraries, budget control, inventories, and program representation. PX 15. Ms. Kobus' duties cover not only DCC, but all the prisons for the State of Delaware. We found Ms. Kobus to be a credible witness, and a diligent and professional worker. However, as is further outlined below, we find that defendants have not provided Ms. Kobus with sufficient guidance and support, have failed to implement her suggestions for improving services, and have relied upon her to fulfill functions beyond the capacities of any single person.

The amount and quality of legal resources and services available at DCC in general, and in the MSU in particular, have varied over time, generally as a result of litigation. At all times relevant to this suit, DCC has contained and operated a main law library for use by inmates in the general population. Since 1988, pursuant to the settlement agreement reached in a class action in the Delaware Court of Chancery, now entitled *Dickerson, et al. v. Castle, et al.*, CA No. 10256, this library is open six hours a day, five days a week, plus one evening a week. *See* DX 4 at ¶ 32. Throughout the time period in which plaintiff was housed at MSU, however, inmates incarcerated in MSU have not been allowed physical access to the main law library.

Instead, there are three types of legal resources and services that have been available to MSU inmates. First, there is a "satellite law library" in MSU, which was established pursuant to a consent decree entered by this Court on December 12, 1985, in *Gary Hearn v. Walter Redman, et al.*, C.A. No. 83–794–MMS. PX 13. Second, DCC has developed a "paging system" through which MSU inmates may request xeroxed copies of materials contained in the main law library. Finally, varying degrees of legal assistance have been provided by paralegals and an attorney.

We had the opportunity to observe and inspect the MSU satellite library during the trial in this case. The library is contained in a small, oblong room, one long wall of which is formed by chain link fencing so that the room is visible from the MSU control station directly across the hall. In the center of the caged room is a single desk, which occupies a substantial portion of the available floor space. At all times relevant to this action, the only bookshelves in the library were housed in three small red metal cabinets, each containing two long shelves. *See* Tr. at A–5. There has also been a rack which holds a variety of preprinted legal forms for inmates' use. At the time of trial, the library also contained four larger six-shelf bookcases, which had been installed in May, 1991, four months after plaintiff had left MSU.

The MSU library is located in a water drainoff area, which floods whenever inmates' sinks or toilets overflow. One enters the area by descending several steps. The bottom approximately eighteen inch strip of each wall is painted a different color to indicate the flooding level. Consequently, the lowest two shelves of each of the four new bookcases are unusable. In addition, the room serving as the MSU library has doubled as a barber shop for inmates' haircuts. Tr. at A–68, A–92, B–173.

The original resources purchased for the MSU library were those set forth in the *Hearn v. Redman* consent decree. As listed in Appendix A, these included several treatises, rule books, and manuals, but no reporters, statutory compilations, or digests. By 1989, the inventory had been expanded, as indicated in Appendix B, to include the Delaware Code Annotated, as well as several volumes each of the United States Code Annotated, the Atlantic 2d Reporter, the Atlantic Digest, and Corpus Juris Secundum. This collection of volumes was not further supplemented until after plaintiff had left MSU. The inventory as of the date of trial, Appendix C, includes many volumes added in May, 1991, through a substantial new purchase of materials. Yet, throughout the existence of the MSU library, some of these books have periodically disappeared. Tr. at B–77. Although there has not been any investigation as to

whether it is in fact the inmates who have stolen the books, Tr. at B–139–40, given the controls placed on MSU inmates, it would be very difficult for an inmate to walk off with an entire book. Tr. at C–108.

Pursuant to the *Hearn v. Redman* consent decree, the MSU library has officially been open daily from 9:00 a.m. to 11:00 a.m. and from 1:00 p.m. to 3:00 p.m. DX 2 at 3. Under official policy, MSU inmates are permitted one visit per day to the satellite law library. Each such visit is limited to one hour. *Id.* During some period of time between July, 1987, and late 1989, inmates were not permitted to visit the MSU law library at all. Tr. at B–173. When visits have been granted, only one inmate is permitted in the library at any one time. Inmates have been expressly forbidden from assisting one another in the MSU library. PX 2 ¶ 22(B)(4). Nor have MSU inmates been permitted to help one another with legal work in any other location. Tr. at A–21, B–21. There is no similar ban on inmate assistance in the general population. Tr. at B–21.

Inmates have gained access to the MSU satellite library by submission of a written request to the 8–4 Shift Lieutenant of the MSU Building. DX 24 at 20; DX 25 at 21. Since July, 1989, prison officials have maintained a log of inmate visits to the library. DX 6. As demonstrated by the log, there has been no set policy in force governing the length of time that an inmate must wait for a library visit after requesting one. Accordingly, this waiting period for the scheduling of a library visit has been neither predictable nor consistent. While in many instances inmates were granted library visits on the same day as their request was submitted, other examples show that an inmate who requested access on September 19, 1989, was not given access until October 4, 1989, and another inmate who submitted a request on March 11, 1990, did not visit the MSU library until March 21, 1990.

During the initial years of the MSU library's operation, inmates were handcuffed during all visits to the library. Tr. at A–27, A–49, A–92. After transporting an inmate to the library area with his hands cuffed behind his back, the guard would simply switch the arrangement so that the inmate's hands were cuffed in front of him. Tr. at A–27. The handcuffs were attached to a waist chain, so that the inmate was able to raise his hands to hold a book in front of him but could not lift his hands above shoulder level. Tr. at C–109. Upon complaints by counsel in another lawsuit in the Delaware Court of Chancery, *Dickerson, et al. v. Castle, et al.,* CA No. 10256, DX 33 at 1, this policy was eliminated as of August 31, 1989. DX 34 at 2; Tr. at A–49, A–101–102.

The second type of legal assistance provided is a paging system, through which MSU inmates may receive copies of materials, which are not available in the satellite library, from the main DCC law library. The main law library, the July, 1991 inventory of which is contained in Appendix D, does house a fairly substantial and current collection of legal research and reference materials.[1] The copies are provided free of charge, and free paper, pens, envelopes, and postage are also available for legal work. Tr. at B–128–29. Under the paging system, an inmate must complete and submit a request form listing the cases to be copied. This form is then forwarded by institutional mail to the DCC main library for processing. DX 25 at ¶ 22(A)(2); Tr. at B–130–31. This procedure is also utilized for requesting copies of legal documents such as motions and briefs to be filed in

---

**1.** Although it is not part of the record and does not form any basis for our decision in this case, we note that our own experience with the DCC main law library indicated that this library is also subject to deficiencies. During the first day of trial in Smyrna, Delaware, we received a question from the jury deliberating in the federal courthouse in Wilmington in an unrelated criminal case. To answer the jury's question, we visited the main DCC law library to conduct legal research. The relevant volume of the United States Code Annotated was missing, and one of the cases we wanted had been cut out of the particular volume of the Federal Reporter 2d. However, although we cannot speak for the treatment received by other library users, the law library personnel were very helpful in quickly locating another copy of the USCA volume from a different library.

court and served on opposing parties. No books are circulated through this or any other system.

Each MSU inmate may request only five cases per week. PX 7; Tr. at B–24. This limit was developed for administrative reasons, due to limited resources. Tr. at B–27. More specifically, Ms. Kobus testified that there is only one photocopy machine available for copying legal materials for all inmates in the State of Delaware. Tr. at B–29. The photocopy machine is devoted to requests from MSU inmates in the morning, and from 6:00 to 10:00 p.m. each Monday evening. Tr. at B–30. Although official policy provides that inmates may receive an exemption from the limit if they demonstrate that a filing deadline is approaching, Tr. at B–25, without evidence of such a deadline, requests by plaintiff for more than five cases in one week have been rejected. PX 24, 26; Tr. at B–157. For example, a request form completed by plaintiff on June 24, 1990, was returned with the notation: "5 cases a *week* Debro. Clerk." PX 24.

In addition, inmates must know the correct citation for cases in order to receive copies. Although Sakee Ali Nasir, an inmate who formerly worked as a law clerk in the DCC main library, testified that he personally would attempt to locate the desired case when an inmate had used an improper citation, Tr. at A–21, the evidence indicates that such efforts at assistance were rare. Rather, if plaintiff's written request contained an inaccurate or incomplete cite, his request for a copy of the case was summarily rejected without any effort made by the DCC library staff to ascertain the correct cite. PX 22, 24, 25. Moreover, in one request rejected as "wrong cite," plaintiff had actually provided a proper citation, albeit without a date, for *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). PX 24. We also take judicial notice that plaintiff's incorrect citation "*Armant v. Marquez,* 772 F.2d 5*2* 2, 5*2*6 (9th Cir.1985)," PX 25 (emphasis added), could easily have been corrected to *Armant v. Marquez,* 772 F.2d 55 2, 55 6 (9th Cir.1985), by checking the table of

cases reported at the beginning of the 772 volume of Federal Reporter 2d.

In order to discover the required proper citations, MSU inmates could only rely on the limited materials available in the MSU library, briefs from opposing counsel in their cases, and Report and Recommendations issued by the Magistrate Judge pursuant to 28 U.S.C. § 636 (1988). As indicated by the 1989 inventory of the MSU library, Appendix B, during all times pertinent to this suit, the MSU satellite library only contained a few volumes each of the United States Code Annotated, Corpus Juris Secundum, and the Atlantic Digest, and it contained none of the following reference materials: a federal digest; a digest of the judicial and magistrate decisions of the United States District Court for the District of Delaware, such as the Delaware District Digest; any digest of decisions of Delaware law, such as the Delaware Law Monthly; the ALR series or any index thereto; or the federal or Delaware Shepard's Citators. Moreover, much of the material that was available was outdated. The Federal Habeas Corpus treatise was a 1969 edition, and until the set was recently replaced, the volumes of the Delaware Code Annotated were all from a previous edition, updated through 1974. Tr. at B–161.

Despite the lack of legal reference materials to enable inmates to obtain proper citations, generalized requests for various rules or statutes have been denied for using improper citation forms. In one instance, plaintiff's November 1, 1989 photocopy form contained the following requests: "a copy of the Institutionalized Person[s] Act (and all amendment[s] if any)," "a copy of State and Federal Court's Administrative Procedures Act," and "Administrative Procedure[s] Act for Bureau of Prisons and Federal Trade Commission." Beside each request on the form, the Department of Corrections paralegal noted: "We need proper cite to fill request." DX 52. The only real exception to the exact cite rule is that the DCC library maintains several files containing a few cases each on specific subject matters, such as rape. An

inmate may request cases on these topics from the files. Tr. at B–33.

The third and final type of legal resource available to MSU inmates is legal assistance from paralegals. In addition to Ms. Kobus, who is herself trained as a paralegal, the Department of Corrections presently employs a staff of five Correctional Legal Assistants statewide. Tr. at B–10. DCC also presently has five inmate librarians. Tr. at B–86. During the time period relevant to this case, up to two staff paralegals were stationed at DCC in addition to Ms. Kobus, see Tr. at B–90–92, as were several inmate librarians. During the time period between July 24, 1989, and October 12, 1989, there was a paralegal assigned specifically to work with MSU inmates for twenty hours per week. Except for that period, however, there was no paralegal physically available to assist MSU inmates. Tr. at B–12–16.

At all other times, MSU inmates have been able to submit a written request for paralegal assistance. Such requests are forwarded by institutional mail to the paralegal department, which will schedule an intake interview. Tr. at B–131. Appointments are scheduled for some portion of the six hours a week of paralegal time available to MSU inmates. See DX 17, DX 25 at ¶ 22(B)(5). The paralegals will attempt to assist the inmates with their questions and will on occasion consult with Ms. Kobus. Tr. at B–132. Often an inmate paralegal will be assigned to respond to an MSU inmate's request. Tr. at B–21.

Ms. Kobus testified that inmates have overly high expectations of the services paralegals are legitimately able to perform. As she explained, many inmates simply want "a remedy that is going to instantly get [them] out of jail," and they are consequently destined to be disappointed. Tr. at B–53. While we have no doubt that this is true, this does not explain or excuse the level of services actually provided by the DCC paralegal department. Rather, due to lack of guidance from their superiors, instructions that they are not permitted to provide any advice, see PX 11, and insufficient training, the work conducted by these paralegals is neither thorough nor particularly accurate.

As for training, Ms. Kobus herself has earned a paralegal certificate and has had legal work experience, unrelated to criminal or civil rights law, in a law office. Tr. at B–5. Each of the three staff paralegals, who worked at DCC while plaintiff was housed in MSU, had also attained a paralegal certificate but had no demonstrated prior legal experience. See DX 10–12. Moreover, there was no evidence that the DCC paralegals received any formal or informal on-the-job training at the commencement of their employment, nor any continuing legal education. In addition, their work product indicates that they were either untrained in methods of legal research, or not permitted by defendants to perform any, or both.

For example, in a letter from plaintiff addressed to Ms. Kobus, he asked whether "state law and rules and policies established by the Department of Corrections make them [sic] a person under the law, and [would she] define government emnity [sic]." DX 41. As a follow up, by letter of November 4, 1989, plaintiff submitted a request for assistance to Ms. Kobus, stating: "I would like any and all information you can get me on government enti[ties]. I need [a] legal definition. I need to know when they can be or become a person, e[tc.] and any other information you [can] give me. I need authorities." DX 40. In response, the paralegal department did not send him the then recently decided case of *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) or even *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), but simply sent him two pages from Black's Law Dictionary containing the definitions of "entity" and "legal entity," and one page from Corpus Juris Secundum defining "entity." DX 40; Tr. at B–148.

In addition, during the period in which plaintiff was housed in MSU, MSU inmates were not given any basic orientation or handbooks explaining how to use the library or to conduct legal research. Nor

has a Department of Correction paralegal ever been present in the MSU satellite library at the same time as an MSU resident. Moreover, some of plaintiff's requests for assistance simply received no response. One such incident occurred after the death of Kay Jacobs, who formerly worked in the DCC library. Plaintiff had previously filed a number of lawsuits against Ms. Jacobs, and he sought assistance regarding whether he could continue these lawsuits and how to do so. On June 19, 1990, he wrote to Francene Kobus:

> Note: I need help in pursuing this complaint on Kay Jacobs. [T]he District Court of Delaware dismissed it while Kay Jacobs was alive but the Appeal[s] Court reversed the d[e]cision. The District Court ordered service on Kay Jacobs. What am I to do? Thank you for your assist[a]nce."

DX 52. Plaintiff received no response. On June 22, 1990, he wrote again to Francene Kobus: "I need assistance. Kay Jacobs killed herself and I have a couple suits against her. I don't know how to handle this situation. This is my second request for legal assistance." DX 52. He still received no response.

A significant part of the problem was demonstrated by the testimony of Richard Hubbard, a Delaware Deputy Attorney General who represented the Department of Corrections from February, 1987, until July, 1988. As he testified at trial, Mr. Hubbard wrote on May 10, 1988, to the paralegal working at DCC at that time, advising him that due to a lack of attorney supervision, the paralegal must be careful to avoid crossing the line into the unauthorized practice of law. PX 11; Tr. at B–107–108. Hubbard's letter instructed the paralegal to "limit your role to the instruction of prisoners in the method of legal research. You are not to provide legal

advice, to draft documents, or to research the law with respect to any pending litigation." PX 11. This advice was clearly taken to heart. As Ms. Kobus testified, she and her paralegal staff will not use their own "mental processes" to assist inmates. Tr. at B–20, B–53, B–67, B–87–88.[2] Hubbard admitted, however, that "at the time [he] wrote this letter, [he] did not do any research on what constitutes unauthorized practice of law." Tr. at B–108. Presumably this was because "this was not at the top of [his] priority list. It was rather towards the bottom." Tr. at B–115.

Furthermore, any potential problems with the unauthorized practice of law should have disappeared as of June 30, 1989, due to the settlement agreement reached in a class action in the Delaware Court of Chancery, from which plaintiff had opted out, which is now entitled *Dickerson, et al. v. Castle, et al.*, CA No. 10256. *See* DX 4. Pursuant to that agreement, the defendants in that action were required to "allocate $15,000 for contractual services to provide for attorney supervision of staff paralegals in their provision of assistance to prisoners ... as soon as possible but no later than June 30, 1989." *Id.* at ¶ 29.

DCC did hire an attorney, Theopolis Gregory, under the terms of this agreement. Yet, even after Mr. Gregory had been hired to perform such supervision, DCC paralegals were still limited to clerical functions. For example, on October 5, 1989, one of the paralegals, Pete Horvath, met with the plaintiff at the Maximum Security Unit. The entirety of the notes recorded by Mr. Horvath describing that meeting read as follows:

> Saw Debro Davis[3] for hour & 10 min. Received Motion & orders to take to law

---

**2.** In fact, Ms. Kobus testified at trial in connection with plaintiff's question on government entities discussed above, that plaintiff "wanted me to comment on the Department's policies, established by the Department.... He wanted me to comment on them and make them either a government entity which he could sue or not sue or hold responsible in some way. And I was not going to do that.... [I]s that not practicing law, telling him that?" Tr. at B–149.

Thus, plaintiff's difficulty in obtaining legal research was not due to a lack of understanding of the nature of his question.

**3.** At the time of his conviction and initial incarceration, plaintiff's last name was Davis. He has since changed his name to Debro Siddiq Abdul–Akbar, although many prison records continue to this day to refer to him by the name of Davis.

library. Needs to see how to answer motion by 30 Oct. Davis was aggressive & demanding not happy with what I do. *Seems to think I should give advice.* DX 45. (emphasis added). Similarly, Pete Horvath met with the plaintiff again on October 10, 1989, and his notes of that meeting read as follows:

> Saw Debro Davis told him about answering motions. Replied it was nothing & worthless info. *Still wants to know how to answer motion.* He said what they sent over from Law Library was no answer. *He questioned that my being over here is not really assistance.* His voice all the time argumentative. Gave me some info to be researched; I told him I would have it researched. *He asked that why don't I do it—What am I here for[?] I told him to take interviews & relay info to inmate paralegals.* Then he said he never got answer to problem we talked about 2 months ago—he became angrier & more accusative—Then said I was perpetrating fraud by doing what I do at MSU. At that point I terminated the interview. Wanted me [to] tell him how to argue point in motion.

DX 45. (emphasis added).

Moreover, Mr. Gregory has not been utilized to provide legal assistance to MSU inmates, or indeed any inmates at DCC. Since July 1, 1989, despite the fact that he was hired pursuant to the *Dickerson* settlement agreement, Mr. Gregory has had no direct contact with any MSU inmate, Tr. at B–9–10, B–133, and has only been consulted by telephone by the paralegal staff on three occasions concerning any of the approximately 1600 inmates at DCC. Tr. at B–136. Moreover, none of these three discussions between Mr. Gregory and a member of the DCC paralegal staff involved a post-conviction proceeding, civil rights matter or any claim asserted against a Department of Corrections employee. Instead, the calls resulted in Mr. Gregory: (1) interceding to obtain a copy of a medical report from the FBI for an inmate; (2) dissuading a defendant in a capital case from discharging his attorney on the eve of trial and proceeding *pro se;* and (3) assisting in procuring the proper documentation for an inmate to obtain his fingerprint file from the FBI. Tr. at B–136–37.

Plaintiff has employed all three forms of legal resources available to him. He has visited the MSU law library on numerous occasions and has frequently requested paralegal assistance. He did not, however, use every possible hour slot available to visit the MSU library and indeed did not appear for every appointment that he had made to use it. This at least in part was due to the fact that at some point he became frustrated with the resources provided and discouraged from further visits. He testified that:

> At one point in time I did try to, when the cases were made available, read the cases that the State would cite or a Court would cite, and if those cases didn't help me, then there was no need for me to really read these cases because I didn't have no means of researching and rebutting these cases. The only thing I can deal with is the facts of what happened and express these facts to the Courts. And that was my course of action throughout my litigation and experiences in dealing with the Court.

Tr. at C–84.

In addition, as calculated by Ms. Kobus, from November, 1987, through June, 1991, through the paging system, DCC made 74,-553 photocopies for plaintiff, DX 52; Tr. at B–124–25, which constituted one-third of all photocopying performed for DCC inmates during this period. Tr. at B–126. Yet, despite this impressive statistic, a review of the photocopy requests, DX 52, demonstrates that the vast majority of these copies were of pleadings for plaintiff's various lawsuits, and not of published cases or statutes. It also shows that the volume of copies increased due to the need to make multiple copies of each such pleading to meet court filing requirements and to complete service on opposing parties. Moreover, we take judicial notice pursuant to Fed.R.Evid. 201, that despite the high volume of pleadings this Court receives from plaintiff, most have recited facts without accompanying citations to legal authority.

As we ourselves can attest, the plaintiff has been a frequent litigant in this Court. During the period in which he was incarcerated in MSU, plaintiff filed 125 actions in the United States District Court for the District of Delaware. DX 47; Tr. at C–61. As of the date of trial, plaintiff had at least 114 suits pending in this Court. DX 47; Tr. at C–62. He has also filed pleadings on behalf of other inmates. Tr. at A–53–55. Four of plaintiff's own suits have been habeas petitions pursuant to 28 U.S.C. § 2254 (1988), and are of particular significance because they demonstrate how the extent and quality of legal services available to MSU inmates affected plaintiff's ability to litigate his lawsuits.

Plaintiff filed his first federal habeas petition in July, 1987. *Davis v. Redman,* C.A. 87–515–JJF. DX 55. In that petition he raised one ground for habeas corpus relief upon which state remedies had already been exhausted, and several additional grounds for which he had not yet met the exhaustion requirement of Section 2254. Consequently, this first petition was dismissed without prejudice pursuant to the total exhaustion rule of *Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982). *Davis v. Redman,* C.A. 87–515–JJF (D.Del. February 22, 1988). A week later, the plaintiff filed a petition for a writ of habeas corpus raising the single exhausted ground, a claim under the Interstate Agreement on Detainers (IAD). *Davis v. Redman,* C.A. 88–126–MMS. That petition was eventually dismissed on the merits. *United States ex rel. Davis v. Redman,* C.A. 88–126–MMS (D.Del.1989), *cert. prob. cause denied,* No. 88–3681 (3d Cir. May 17, 1989), *cert. denied,* 493 U.S. 863, 110 S.Ct. 179, 107 L.Ed.2d 134 (1989).

Shortly thereafter, plaintiff filed a third petition for habeas corpus relief, which was denied on the ground that none of the claims asserted were appropriately raised in a habeas application. *Abdul–Akbar v. Redman,* C.A. 88–681–JLL (D.Del. February 8, 1989), *cert. prob. cause denied,* No. 89–3113 (3d Cir. July 14, 1989). Finally, after he had exhausted his state remedies

in connection with the previously unexhausted claims asserted in his original application, plaintiff filed a fourth habeas petition in 1989. *Abdul–Akbar v. Redman,* C.A. 89–425–JRR. We dismissed most of the claims in that petition for abuse of the writ pursuant to Rule 9(b) of the Rules Governing § 2254 Cases, as construed in *McCleskey v. Zant,* —— U.S. ——, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991). *Abdul–Akbar v. Redman,* C.A. 89–425–JRR (D.Del. May 14, 1991). DX 50. Under those standards, we found that plaintiff was "required to present all his claims at once, and must therefore have waited to present his IAD claim if he wanted to preserve all his claims." *Id.,* Order at 3.

Yet, as plaintiff testified in this action, at the time that he filed his petition in C.A. 88–126–MMS, he was not aware that he was committing a procedural default which might prevent him from asserting his other claims once they had been exhausted in state court. Tr. at B–171–72. He stated at trial that had he been able to discover then, in 1988, what he has been able to learn through several years of actual litigation experience, he "would have waited until [he had gone] back and presented all issues to [the] State Courts before [he] presented any issues to the Federal Court in relation to a habeas corpus petition." Tr. at B–172.

On several occasions, Ms. Kobus discussed the state of legal services available to MSU inmates at least with Defendants Risley, Hobler, and Redman. Tr. at B–62–63. In her words, these defendants did not put her under any "pressure to purchase new materials and develop [the MSU library] further," than was required under the *Hearn v. Redman* consent decree, because they felt that compliance with the decree was sufficient. Tr. at B–61–62. Moreover, many of Ms. Kobus' suggestions for additional purchases of materials have not been heeded. For example, she told Defendant Redman that the MSU library should include "Regional reporters, Federal Reporter ... [as well as] encyclopedias, which would be CJS or the Am Jur, U.S. Lawyers' Edition, Supreme Court Reporter, Federal Digest, Atlantic Reporter 2d, the Atlantic Digest 2d, and the Shepard Cita-

tor, federal and state systems." Tr. at B–58. Even as of the date of trial, however, only a few volumes of even fewer items on this list had been added to the MSU library's collection.

In addition, the alleged inadequacy of the legal resources provided to MSU inmates was brought to the attention of the defendants by Neilsen Himelein, attorney for the class of inmates in the Court of Chancery action, *Dickerson, et al. v. Castle, et al.,* CA No. 10256, as discussed above. Defendant Watson was notified by the letter of Mr. Himelein dated June 9, 1989, PX 21 at 3, and Defendants Watson, Risley, and Redman were further put on notice by Mr. Himelein's letter of August 17, 1989. DX 33. Moreover, service of process of the complaint in this case was accomplished in June, 1989.

Nonetheless, as stated in the "Inmate Housing Rules for Maximum Security Unit" which are approved and signed by Defendant Redman, during all times pertinent to this suit, it was the express written and enforced policy of DCC with respect to MSU inmates that:

> The providing of legal aid service is *not* a responsibility of the Department of Correction. However, the Institution [DCC] does attempt to make available a limited amount of legal reference material.

DX 24 at ¶ 22(A)(1); DX 25 at ¶ 22(A)(1) (emphasis added). Interestingly, it was not until May 15, 1991, exactly one month after this Court denied defendants' motion for summary judgment in this action, that the defendants publicly acknowledged their legal obligation to provide legal aid services to inmates. Effective May 15, 1991, that same paragraph now reads:

> The providing of legal aid services *is* a responsibility of the Department of Corrections. The Institution does attempt to make available a limited amount of legal reference material.

PX 6 at ¶ 22(A)(1) (emphasis added).

### B. *Security Considerations*

As demonstrated by the testimony of Major Barry Hawlk, Security Superintendent for DCC, the policy prohibiting MSU inmates from having direct physical access to the main DCC law library was motivated by several security concerns. Most significantly, prison officials built MSU as a separate building removed from all other DCC facilities in order to minimize the flow of contraband to maximum security inmates and to better enable correctional officers to control MSU inmates' behavior. Tr. at C–103. Presently, MSU inmates are only brought to the main buildings when required for medical reasons. *Id.*

Moreover, now that the segregation of MSU inmates has been accomplished, were MSU inmates to visit the main law library, prison officials would be confronted with the additional logistical difficulties of gathering sufficient vehicles and staff to transport them to the main facility. *Id.* Major Hawlk testified that this would require "a massive amount of staff." Tr. at C–104. This is because DCC's practice has been to ensure that when dealing with maximum security inmates, correctional staff always have a numerical superiority over the inmates, to give them an advantage in any disruptive or violent incidents. Tr. at C–104. Another manifestation of the numerical superiority policy is that prison officials severely restrict the amount of interaction MSU inmates may have with one another. Tr. at C–96.

The concerns over limiting the flow of contraband focus on items that may be used as weapons, and on those that pose health hazards. For example, typewriters are prohibited because inmates may dismantle them and use the parts either for weapons or for tattoo guns. Tr. at C–99–100. Tattoo guns are dangerous because they tend to spread disease. Tr. at C–100. Moreover, any type of material that could be smuggled in and used as a weapon would also be considered contraband. Tr. at C–114. Were MSU inmates to be transported to and from the DCC main compound on a regular basis, the flow of contraband items into MSU would increase. As Major Hawlk testified, this is not only due to the greater number of opportunities for outside contact, but also because "[t]he more often that people leave and return to maximum security, the greater the chance

that the inmate learns the staff members' behavior and is able to smuggle something by." Tr. at C–113. These problems with contraband are also posed by inmates in the general population, but with MSU inmates, the incidents tend to be more violent. Tr. at C–114–15.

Despite these legitimate security considerations, Major Hawlk's testimony did not indicate that security concerns would preclude the possibility of transporting MSU inmates to the main law library. Rather, he stated that, "I don't see the advantage of why they would need to go to the main law library, besides all the problem[s] of the transportation and the additional staff that it would take, plus the procedures we would have to introduce to try to prevent the flow of contraband." Tr. at C–116–17. In addition, there is no evidence that the plaintiff himself presented any special security concerns; rather, each of the security considerations discussed applied to MSU inmates in general. Tr. at C–112–13, C–115.

As for the policy preventing MSU inmates from working together in the MSU library or elsewhere, Major Hawlk explained that this simply stemmed from staffing concerns and the strategy of maintaining a numerical superiority of correctional officers over inmates. He stated that only one officer is available to monitor the law library, and consequently only one inmate is permitted in the library at a time; in order to permit more than one inmate in the library at a time and maintain a numerical advantage, he would be required to transfer officers from other activities. Tr. at C–99. As the plaintiff testified, however, such meetings among inmates have been successfully accomplished without security problems on several occasions, when courts have ordered that inmates be permitted to assist each other with legal work. Tr. at B–176. These incidents occurred before Major Hawlk assumed his duties as Security Superintendent, and he had no knowledge of them. Tr. at C–107.

Major Hawlk also testified about the reasons why, until August, 1989, inmates were handcuffed while using the MSU library.

He stated that this was done so that, when the correctional officer "went in to terminate the law library period and bring the person out, he was already secured." Tr. at C–110. He further testified, however, that it would be possible for guards to handcuff an inmate without the need to enter the library room, by requiring the inmate to extend his hands through the door. Tr. at C–111. The now-abandoned handcuffing policy had been approved by Defendant Redman. Tr. at C–112.

## III. CONCLUSIONS OF LAW

### A. *Constitutional Standards*

■ Under the Fourteenth Amendment, prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977); *Peterkin v. Jeffes*, 855 F.2d 1021, 1036–38 & n. 18 (3d Cir.1988). This right requires that "prison authorities [must] assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498. It is particularly important that officials provide inmates with access to a source of current legal information, so they may discover whether they have claims at all. *Id.* at 826 n. 14, 97 S.Ct. at 1497 n. 14. Moreover, the right to adequate law libraries or legal assistance is especially critical in protecting the ability of prisoners to litigate habeas corpus and civil rights actions, because these cases "directly protect our most valued rights." *Id.* at 827, 97 S.Ct. at 1498.

■ To meet their obligations, prison officials may construct programs containing a combination of library resources and assistance from legally trained persons. Programs must be evaluated as a whole to determine their compliance with constitutional standards. *Id.* at 831–32, 97 S.Ct. at 1499–1500. Prison officials have "affirmative obligations to assure all prisoners meaningful access to the courts." *Id.* at 824, 97 S.Ct. at 1496. Consequently, the state bears the burden of demonstrating that the program it establishes adequately

protects the inmates' rights. *Tillery v. Owens,* 719 F.Supp. 1256, 1282 (W.D.Pa. 1989), *aff'd on other grounds,* 907 F.2d 418 (3d Cir.1990).

Moreover, because this constitutional right places affirmative obligations on prison officials, defendants' reliance on the rational relationship test of *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), is misplaced. The *Turner* inquiry of whether a prison regulation is "reasonably related to legitimate penological interests," *id.* at 89, 107 S.Ct. at 2261, applies when "a prison regulation impinges on inmates' constitutional rights." *Id.* However, when a positive obligation has been placed upon prison officials to fill a constitutionally mandated requirement, such as access to a law library, the rational relationship test cannot be construed to eviscerate that obligation.

■ Under the *Bounds* inquiry, should prison authorities decide to fulfill their obligations by providing an adequate law library, inmates must be afforded a reasonable amount of time to use the library. *Tillery,* 719 F.Supp. at 1282 (four hours a month in library is not sufficient). If prison officials decline to provide all inmates with direct access to an adequate law library, the alternate means of providing legal assistance "must be of at least equal caliber," *Valentine v. Beyer,* 850 F.2d 951, 955 (3d Cir.1988), even for inmates in segregated security areas. *Peterkin,* 855 F.2d at 1038.

■ Restrictions on direct access to an adequate law library may be justified by legitimate security concerns. *United States ex rel. Para–Professional Law Clinic v. Kane,* 656 F.Supp. 1099, 1104 (E.D.Pa.), *aff'd* 835 F.2d 285 (3d Cir.1987), *cert. denied,* 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988). Under this standard, however, prison officials must demonstrate specific security considerations that the access limitations address, and may not "restrict the scope of inmates' constitutional rights by making automatic and conclusory assertions of discipline and security in the support of restrictive policies." *Id.* at 1107; *see, e.g., Caldwell v. Miller,* 790 F.2d

589, 593 & n. 3, 606 (7th Cir.1986) ("unique disciplinary and security considerations" at Marion Penitentiary, the prison with the highest maximum security classification in the federal prison system, following riot in which one prisoner and two guards were killed).

The United States Court of Appeals for the Third Circuit has reserved decision on the question of whether a library paging system provides sufficient access to a law library for inmates in segregated units. *Peterkin v. Jeffes,* 855 F.2d 1021, 1038 (3d Cir.1988). It has, however, strongly suggested that such systems are not alone constitutionally adequate. *Id.* at 1038 n. 22 ("We note, however, that we have recently rejected a plan in Trenton State Prison proposing reduced paralegal assistance for prisoners in close custody limited to a library paging system. Paging systems ... as the sole legal assistance furnished to inmates, have been rejected consistently by other courts of appeals." (citations omitted)). In addition, the *Peterkin* court quoted with apparent approval the following passage:

> Ordinarily, a prisoner should have direct access to a law library if the state chooses to provide a prison law library as its way of satisfying the mandate of *Bounds.* Simply providing a prisoner with books in his cell, if he requests them, gives a prisoner no meaningful chance to explore the legal remedies that he might have. Legal research often requires browsing through various materials in search of inspiration; tentative theories may have to be abandoned in the course of research in the face of unfamiliar adverse precedent. New theories may occur as a result of a chance discovery of an obscure or forgotten case. Certainly a prisoner, unversed in the law and the methods of legal research, will need more time or more assistance than the trained lawyer exploring his case. It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult.

*Id.* (quoting *Williams v. Leeke,* 584 F.2d 1336, 1339 (4th Cir.1978), *cert. denied,* 442

U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979)); *accord Para–Professional Law Clinic*, 656 F.Supp. at 1104.

■ If prison officials decide to provide "adequate assistance from persons trained in the law," *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498, rather than access to law libraries, the inmates must receive sufficient assistance from legally trained persons so that their access to the courts is "of at least equal caliber." *Valentine*, 850 F.2d at 955. Under this standard, an untrained legal research staff is not sufficient. *Id.* at 956. Should prison authorities choose to rely *exclusively* on providing assistance from lawyers, the lawyers must be available to assist the inmates for all relevant legal proceedings. *Peterkin*, 855 F.2d at 1042.

■ Finally, although in many right of access cases a plaintiff must demonstrate an "actual injury" in order to establish his or her claim, *see, e.g., Hudson v. Robinson*, 678 F.2d 462, 466 (3d Cir.1982), it is not necessary to prove actual injury when the plaintiff's suit "directly implicates the core *Bounds* issue" of whether the inmate has adequate access to a law library or persons trained in the law. *Peterkin*, 855 F.2d at 1040–42. Since plaintiff's claims are of this core type, he need not show an actual injury in order to establish defendants' liability.

B. *Whether Defendants Have Fulfilled Their Obligations*

In the present case, prison authorities have chosen to offer MSU inmates a combination of library resources and assistance from persons trained in the law. As the Commissioner of the Delaware Department of Correction, the Bureau Chief of the Department's Bureau of Prisons, the Warden of DCC, and the Education Director of the Department of Corrections, Defendants Watson, Risley, Redman, and Hobler respectively are the officials responsible for these policies. Moreover, we have found that the defendants have discussed the provision of legal resources to MSU inmates with Ms. Kobus, and have been on notice of the alleged deficiencies in this system at least since June, 1989.

To determine whether the defendants have fulfilled their constitutional obligations, we must evaluate the total effect of the particular mix of resources available to MSU inmates. *Bounds*, 430 U.S. at 832, 97 S.Ct. at 1500. Before doing so, however, we will first separately analyze each of the three types of legal services available, to assess whether any of them alone may meet constitutional standards.

First, we have no difficulty in concluding that the MSU satellite library is not itself an adequate law library that would alone be sufficient under *Bounds*. Leaving aside the fact that the small caged room used for the library is frequently either flooded or dedicated to use as a barber shop, throughout the time plaintiff was housed in MSU, the library's holdings were meager and not kept up to date. The library's holdings of state law were limited to a 1974 set of the Delaware Code Annotated, several volumes each of the Atlantic 2d Reporter and the Atlantic Digest, and treatises on torts and criminal law. Moreover, at the time the 1989 inventory was conducted, *see* Appendix B, volume 527 of the Atlantic 2d Reporter, which contains cases through 1987, was the most recent of the few volumes available.

Furthermore, the only sources of substantive federal law provided were several volumes of the United States Code Annotated and the 1969 edition of a treatise entitled Federal Habeas Corpus; the library did not contain any federal digests or reporters. Access to a source of federal law is necessary, however, in order for inmates properly to file and litigate habeas petitions and civil rights cases, and, as noted above, the right of access to an adequate law library must be safeguarded for these types of cases especially. *See Bounds v. Smith*, 430 U.S. 817, 827, 97 S.Ct. 1491, 1497, 52 L.Ed.2d 72 (1977). Moreover, in reviewing the holdings of prison law libraries, courts have indicated that some federal reporters are necessary. *See, e.g., id.* at 819 n. 4, 97 S.Ct. 1493 n. 4 (noting that list including Supreme Court

Reporter (1960–present), Federal 2d Reporter (1960–present), and Federal Supplement (1960–present) generally "adheres to a list approved as the minimum collection for prison law libraries by the American Correctional Association (ACA), American Bar Association (ABA), and the American Association of Law Libraries"); *Para–Professional Law Clinic*, 656 F.Supp. at 1100–01 & n. 1, 1103 (approving library whose holdings included United States Supreme Court Reports, Federal Reporter, Federal Supplement, and digests of federal law, and noting improvement since earlier decision criticized lack of these items).

In addition, when inmates have been permitted to visit the satellite library, they may only stay for one hour. Since, as the Third Circuit has recognized, "[l]egal research often requires browsing through various materials in search of inspiration," *Peterkin*, 855 F.2d at 1039 n. 22 (quoting *Williams*, 584 F.2d at 1339), it is difficult to achieve significant progress in one hour, even for those trained to conduct legal research. Nor is a paralegal or even another inmate ever present in the library to provide assistance during these brief library visits. Moreover, during the period prior up until August 1989, when MSU inmates were handcuffed while using their library, research may have been even more cumbersome and time consuming.

We further find that the paging system to the DCC main library is not itself sufficient to safeguard inmates' rights under *Bounds*. As we have already stated, the Third Circuit has suggested that such systems cannot meet constitutional standards alone without additional means of access to legal resources. The particular type of paging system offered at MSU is even less helpful than those criticized by other courts in this Circuit. For example, a paging system under which inmates could request three or four *books* at one time has been found inadequate, *see United States ex rel. Para–Professional Law Clinic v. Kane*, 656 F.Supp. 1099, 1104 (E.D.Pa.), *aff'd*, 835 F.2d 285 (3d Cir.1987), *cert. denied*, 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988), but under the MSU system an in-

mate may only request xeroxing of a maximum of five *cases* per week.

Similarly, another court found that a paging system was insufficient to alone meet the *Bounds* standards in part because "it may take several requests for case digests before [inmates] target relevant case citations," *Tillery v. Owens*, 719 F.Supp. 1256, 1282 (W.D.Pa.1989), *aff'd on other grounds*, 907 F.2d 418 (3d Cir.1990), but MSU inmates are not permitted to take books out of the library, and therefore cannot even request a case digest. *See also Toussaint v. McCarthy*, 801 F.2d 1080, 1109–10 (9th Cir.1986) (paging system allowing inmates to receive only five books per week insufficient), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987); *Green v. Ferrell*, 801 F.2d 765, 772–73 (5th Cir.1986) (paging system permitting inmates to receive two books at a time, twice a week, insufficient).

While we do not intend to suggest that a paging system must permit books to circulate, the contrast with other cases demonstrates how severely the five cases a week limitation impairs the ability of inmates to conduct legal research. Any single lawsuit is likely to involve multiple issues, and, in the vast majority of circumstances, legal research of each individual issue will require reviewing far more than five cases. As the *Bounds* court stated:

It would verge on incompetence for a lawyer to file an initial pleading without researching such issues as jurisdiction, venue, standing, exhaustion of remedies, proper parties plaintiff and defendant, and types of relief available. Most importantly, of course, a lawyer must know what the law is in order to determine whether a colorable claim exists, and if so, what facts are necessary to state a cause of action.

If a lawyer must perform such preliminary research, it is no less vital for a *pro se* prisoner. Indeed despite the "less stringent standards" by which a *pro se* pleading is judged, *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972), it is often more important that a prisoner complaint set

forth a nonfrivolous claim meeting all procedural prerequisites, since the court may pass on the complaint's sufficiency before allowing filing *in forma pauperis* and may dismiss the case if it is deemed frivolous. See 28 U.S.C. § 1915. 430 U.S. at 825–26, 97 S.Ct. at 1496–97.

Nor does the fact that plaintiff may have taken more than ample advantage of, or even abused, the photocopying services available indicate that these services are constitutionally sufficient. Despite defendants' repeated emphasis on the quantity of copies made for plaintiff, the majority of these xeroxes are irrelevant to our inquiry into whether defendants have provided adequate access to a law library or assistance from persons trained in the law. Although defendants are likely in compliance with their separate obligations to ensure that inmates have access to file pleadings and litigate cases in the state and federal courts, *see Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), the present action involves the requirements of *Bounds* that prison officials provide inmates with *"meaningful* access to the courts" through law libraries or assistance from legal professionals. 430 U.S. at 824.

■ Moreover, implementing an exact-cite paging system without providing inmates with sufficient resources from which to locate citations does little to assist them with their research. As we have set forth above in some detail, throughout plaintiff's time in MSU, the MSU library included almost no digests and few other sources containing case citations. In fact, we have further found that, even when MSU inmates have succeeded in locating citations, requests have been denied for what may be characterized as insignificant typographical errors. *See, e.g.,* PX 25. As other courts have noted, prison authorities cannot meet their constitutional obligations by supplementing an inadequate law library with an exact-cite paging system, if inmates have no resources from which to obtain the exact citations. *See, e.g., Corgain v. Miller,* 708 F.2d 1241, 1248, 1250 (7th Cir.1983); *Morrow v. Harwell,* 768 F.2d 619, 623 (5th Cir.1985).

Furthermore, the MSU paging system does not provide maximum security inmates with legal assistance of "at least equal caliber" as that available to inmates in the general population. *See Valentine v. Beyer,* 850 F.2d 951, 955 (3d Cir.1988). Other DCC inmates may visit the well-stocked main law library for hours at a time, and may view as many cases per visit as they can find. They may also consult with one another and with the staff paralegals and inmate librarians during their library visits.

As for the provision of assistance to MSU inmates by legal professionals, it too is alone insufficient to meet constitutional standards. No MSU inmate has received any assistance from Mr. Gregory, the staff attorney hired under the *Dickerson* settlement agreement, and the paralegal assistance has amounted to little more than filling photocopy requests under the paging system. Even after Mr. Gregory was hired and their concerns about the unauthorized practice of law should have been alleviated, DCC paralegals did not perform any services that may be termed legal research. In order to meet the requirements of *Bounds* by exclusive reliance on legal professionals, however, assistance must be available from lawyers for all relevant legal proceedings. *Peterkin v. Jeffes,* 855 F.2d 1021, 1042 (3d Cir.1988). Clearly, DCC has not even attempted to meet its obligations in this manner.

■ Having concluded that none of the three parts of the legal services package offered to MSU inmates is alone sufficient under *Bounds,* we must further assess the adequacy of the total system. We conclude that, as demonstrated by our separate analyses of each component, the combination of services available to MSU inmates essentially amounts to a limited paging system under which exact citations must be gleaned from the satellite law library and paralegals then fill the photocopy requests. Since the contents of the satellite library during plaintiff's incarceration at MSU were of limited assistance for locating citations and the paralegals have offered no guidance on where to look for

the appropriate citations, we find that this paging system is constitutionally inadequate.

Our conclusion in this regard does not indicate that an expanded paging system, if properly supplemented by real legal research assistance from paralegals and a library containing a full and updated set of digests and treatises from which citations may be located, would similarly fail to meet constitutional standards. Defendants have demonstrated specific security considerations justifying their decision not to transport MSU inmates to the main law library. *See Para–Professional Law Clinic*, 656 F.Supp. at 1107. Having already made a decision, based on valid security considerations, to locate MSU outside the main fence surrounding DCC, it would now pose serious burdens on prison officials to assemble sufficient vehicles and staff to transport the inmates to the main compound, while still maintaining control over inmate behavior and the flow of contraband. Thus, although we believe that such transportation of inmates is still one remedial option, defendants need not provide direct access to the main law library in order to fulfill their constitutional obligations.

We do not, however, accept many of the justifications defendants have offered for various other policies at issue in this action. For example, if the five cases a week limit under the paging system results from the fact that the Delaware Department of Corrections has only provided one photocopy machine to copy inmates' legal materials, then it may be necessary to purchase one or more additional photocopiers. Similarly, if the rule prohibiting more than one inmate from visiting the MSU library at once stems from the fact that only one correctional officer has been available to supervise the library, it may be necessary to assign another correctional officer to the area when the library is in use. We further note that the explanation, which was offered for the now-abandoned policy of handcuffing MSU inmates during library visits, provides no justification whatsoever for that policy. This is especially true given Major Hawlk's admission that inmates could easily be handcuffed at the conclu-

sion of each library session without need for the correctional officer to enter the library.

In addition, the concern for avoiding the unauthorized practice of law by paralegals does not justify the relegation of paralegals to mere clerical functions. Defendants are correct that Delaware law clearly prohibits the unauthorized practice of law, *see Delaware State Bar Ass'n v. Alexander*, 386 A.2d 652, 661 (Del.), *cert. denied*, 439 U.S. 808, 99 S.Ct. 65, 58 L.Ed.2d 100 (1978), and we agree that Richard Hubbard's letter on the subject was motivated by valid concerns. Yet, as Mr. Hubbard himself admitted at trial, in defining what constituted the unauthorized practice of law, his "interpretation was rather broad." Tr. at B–108. Moreover, as noted above, Mr. Gregory was specifically hired pursuant to the *Dickerson* settlement agreement "to provide attorney supervision of staff paralegals in their provision of assistance to prisoners." DX 4 at ¶ 29. Thus, from June 30, 1989, onward this concern should have evaporated.

Lastly, we find it inexcusable that defendants simply relied on the *Hearn v. Redman* consent decree and ignored their constitutional obligations as set forth in *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), and further explained in *Peterkin v. Jeffes*, 855 F.2d 1021 (3d Cir.1988) and *Valentine v. Beyer*, 850 F.2d 951 (3d Cir.1988). It should not have required an order by this Court denying summary judgment in this action, before defendants finally recognized on May 15, 1991, that they have an affirmative constitutional duty to provide access to an adequate law library or assistance from legal professionals.

## C. *Barriers to Relief Against the Defendants*

In their post-trial brief, defendants raise two arguments as to why they should not be held liable in this action even if we find that the legal access system provided to MSU inmates is constitutionally inadequate. First, they assert that as supervisory officials, they cannot be held liable

unless plaintiff demonstrates that they were "deliberately indifferent" to his rights. *See City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989); *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir.1989). As defendants appear to have forgotten, we already rejected this argument in our Order of April 15, 1991 denying their summary judgment motion.

As we noted at that time, the deliberate indifference standard applies when a plaintiff has alleged that supervisors failed to train their employees to protect the plaintiff's rights. *See Sample*, 885 F.2d at 1116–18. Here, however, defendants have not been sued for their failure to train and supervise, but for their failure to comply with their own constitutional duties. Under *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), prison officials have *"affirmative* obligations to assure all prisoners meaningful access to the courts," *id.* at 824, 97 S.Ct. at 1496 (emphasis added). Moreover, the *Bounds* Court further stated that "the fundamental constitutional right of access to the courts *requires prison authorities* to assist inmates" by providing adequate access to law libraries or to persons trained in the law. *Id.* at 828, 97 S.Ct. at 1498 (emphasis added). Thus, defendants themselves have an affirmative duty to protect this particular constitutional right of inmates, and consequently they have been appropriately sued in this case. In addition, even if the "deliberate indifference" standard did apply, given the fact that defendants' written policies throughout the time relevant to this action directly contradicted clear Supreme Court precedent, we would have no difficulty concluding that defendants' attitudes may be so characterized.

Second, defendants rather belatedly assert for the first time that they are protected by qualified immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). As a preliminary matter, we question whether a claim of qualified immunity should even be considered when, as here, it is not raised until post-trial briefing. The entire rationale for qualified immunity is to "permit

the defeat of insubstantial claims without resort to trial," *id.* at 813, 102 S.Ct. at 2736, and to protect officials from "the costs of trial [and] the burdens of broad-reaching discovery." *Id.* at 817–18, 102 S.Ct. at 2738.

In any event, even leaving such concerns aside, defendants are not entitled to qualified immunity. *Harlow* provides that government officials performing discretionary functions are immune from liability for damages so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. Under this doctrine, rights are considered "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). More specifically, qualified immunity applies if "reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful." *Good v. Dauphin County Social Services for Children and Youth*, 891 F.2d 1087, 1092 (3d Cir.1989).

Since *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), was decided ten years before plaintiff arrived at MSU, and within a year of his arrival that decision was further clarified by such decisions as *Peterkin v. Jeffes*, 855 F.2d 1021 (3d Cir.1988) and *Valentine v. Beyer*, 850 F.2d 951 (3d Cir.1988), we have no trouble concluding that the rights asserted in this action were clearly established at the time. While defendants are correct that the *Bounds* court encouraged states to experiment with various packages of resources to meet their obligations, 430 U.S. at 832, the Court set forth sufficient guidelines for the range of acceptable plans that defendants should have known they were not fulfilling their responsibilities.

### D. *Relief*

Having concluded that defendants have failed to meet their constitutional obli-

gations and that they are not protected by qualified immunity, we must now consider what relief is available to plaintiff. Plaintiff has requested that we award damages, prospective injunctive relief, and attorneys' fees. We agree that all three types of remedies are available, although some further briefing is required to determine the appropriate extent of each type of relief.

■■■■■ As to damages, both compensatory and punitive damages are available in suits brought under 42 U.S.C. § 1983 (1988). *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Punitive damages are appropriate when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56, 103 S.Ct. at 1640. Under this standard, we find that the defendants in the present action were recklessly indifferent to the constitutional rights of plaintiff and other MSU inmates. In addition to our many findings concerning the inadequacy of the law library and legal assistance provided to MSU inmates, two pieces of evidence in particular compel our conclusion.

First, defendants did not permit the DCC paralegals to perform legal research. Rather, they relied on a carelessly rendered and overbroad definition of what constitutes the unauthorized practice of law, and continued this misguided policy even after an attorney had been retained to supervise the paralegals. Second, there is the language of the "Inmate Housing Rules for Maximum Security Unit." Despite the clear mandate of *Bounds,* until one month after we denied defendants' summary judgment motion in this very case, that manual provided with respect to MSU inmates that:

> The providing of legal aid service is *not* a responsibility of the Department of Correction. However, the Institution [DCC] does attempt to make available a limited amount of legal reference material.

DX 24 at ¶ 22(A)(1); DX 25 at ¶ 22(A)(1) (emphasis added).

■■■■ We also believe that plaintiff is entitled to an award of compensatory damages. While no actual injury need be prov-

en to establish liability under *Bounds, see Peterkin v. Jeffes,* 855 F.2d 1021, 1040–41 (3d Cir.1988), we find that in addition to having established liability, plaintiff has also suffered an injury justifying an award of compensatory damages. Beyond the clear deprivation of constitutional rights plaintiff has endured, he has also suffered the, what is now considered to be, unnecessary physical restraint of being handcuffed while attempting to use the MSU library and exercise his constitutional rights. He also experienced failures to respond to his requests for legal materials and denials of his requests for cases even for mere typographical errors, despite his diligence in attempting to locate case law from the scarce resources provided.

As this Court held in a much earlier case alleging denial of access to legal materials at DCC, although such damages are difficult to calculate, we must "be guided by conscience, a sense of fairness, and the well established rule that the difficulties inherent in translating human experience into economic worth must not preclude compensation for a demonstrated loss." *Johnson v. Anderson,* 420 F.Supp. 845, 852 (D.Del.1976). In *Johnson,* this Court awarded the plaintiffs $300.00 each as compensatory damages. *See id.; see also Brooks v. Andolina,* 826 F.2d 1266, 1269–70 (3d Cir.1987) (holding inmate was entitled to presumed damages to compensate for loss of such privileges as use of the law library). Using *Johnson* as our guide, and considering the effects of inflation in the fifteen years since the *Johnson* decision, we will award plaintiff the sum of $750.00 in compensatory damages, and an equal amount in punitive damages, with the total liability of $1,500.00 to be divided equally by the four defendants.

Plaintiff also claims he was injured by the fact that several claims that he raised in his first habeas petition which was dismissed under the total exhaustion rule of *Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982), *see Davis v. Redman,* C.A. 87–515–JJF (D.Del. February 22, 1988), were never heard on the merits. Plaintiff alleges that this occurred

because he did not know, and was not able to discover, that he was required to present all his claims at once. *See McCleskey v. Zant,* —— U.S. ——, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). Consequently, by litigating his single already exhausted claim in *United States ex rel. Davis v. Redman,* C.A. 88–126–MMS (D.Del.1989), *cert. prob. cause denied,* No. 88–3681 (3d Cir. May 17, 1989), *cert. denied,* 493 U.S. 863, 110 S.Ct. 179, 107 L.Ed.2d 134 (1989), he was thereafter barred from raising the remaining grounds for habeas under the abuse of the writ doctrine. We cannot, however, make a finding in favor of plaintiff on this claim for a number of reasons, including the fact that it was not timely raised, plaintiff did not state it as a ground for relief until he brought it up at trial, nor has he met his burden of establishing that the claims that were precluded under the combined effect of the exhaustion and abuse of the writ doctrines were indeed meritorious.

Second, we find that prospective injunctive relief is both available and appropriate in this action. When state officials are sued in their official capacities under Section 1983, a court may grant prospective injunctive relief. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 2311 n. 10, 105 L.Ed.2d 45 (1989). Moreover, although plaintiff has not been incarcerated in MSU since February, 1991, this case easily meets the "capable of repetition, yet evading review" exception to the mootness doctrine. *See Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam). More specifically, given the procedures through which inmates may be classified into and out of maximum security, there is a reasonable expectation that plaintiff could again be incarcerated at MSU.

We decline, however, to ourselves design a new package of legal resources for MSU inmates. The Supreme Court held in *Bounds v. Smith,* 430 U.S. 817, 831–32, 97 S.Ct. 1491, 1499–1500, 52 L.Ed.2d 72 (1977), that a wide variety of alternatives may be employed to provide inmates with adequate law libraries or assistance from persons trained in the law. We will consequently order that defendants devise a new plan and submit it for our review. Nonetheless, we believe that it is appropriate to set forth certain guidelines.

We first note that, while we have held that defendants are not required to permit MSU inmates to have direct physical access to the main law library, Major Hawlk's testimony did not demonstrate that security considerations preclude this possibility, but only that additional staffing would be required. Thus, it remains a viable option for defendants to transport MSU inmates to the main law library. Should defendants choose not to implement such a policy, other changes will be required.

For example, although the MSU library has been improved since the time plaintiff left, having reviewed the July, 1991, inventory, we find it is still insufficient not only as an adequate law library competing with the main library, but also as a source for citations to complement the paging system. Should defendants wish to develop the MSU library to better serve the paging system, they may wish to purchase a current set of Atlantic and Federal Digests, as well as further volumes of the United States Code Annotated, legal encyclopedias, and/or treatises. Such an expansion of holdings will likely require moving the MSU library to a larger room—hopefully one which is less subject to flooding.

If defendants plan to rely at all on the provision of legal services by paralegals, they should utilize the services of their staff attorney to supervise these paralegals, so that the paralegals will be able to perform actual legal research. It is likely that further training of the paralegals will also be necessary. Moreover, such legal assistance cannot be limited to such matters as obtaining FBI files; it must also be provided for civil rights and habeas cases. Lastly, if defendants choose to rely on the paging system, they must significantly expand the number of cases inmates may obtain per week, perhaps by purchasing one or more additional photocopy machines. Even assuming the library is expanded to provide inmates with improved sources for

citations, the five case a week limit seriously impairs inmates' abilities to conduct effective legal research.

Under the third and final type of relief requested, we find that as the "prevailing party," plaintiff is entitled to attorneys' fees pursuant to 42 U.S.C. § 1988 (1988), to compensate his attorney, Brian Bartley, for his very helpful services throughout the trial, pre-trial preparations, and post-trial briefing. *See Kentucky v. Graham*, 473 U.S. 159, 163–64, 105 S.Ct. 3099, 3104, 87 L.Ed.2d 114 (1985). We will order that plaintiff's attorney submit by affidavit an accounting of his hours, his hourly fee, and his costs in litigating this case.

An appropriate order will follow.

### APPENDIX A

#### MSU LAW LIBRARY INVENTORY— 1986

1. Black's Law Dictionary

2. Harvard Law Review Assoc., A Uniform System of Citation (13th ed. 1982)

3. Criminal Procedure in a Nutshell; West edition, Lowey

4. Sokol, Ronald P., Federal Habeas Corpus, Michie, 1969, second edition

5. The Rights of Prisoners, Rudovsky, Bronstein and Koren (ACLU Handbook Series)

6. Israel, Hand and LaFave, Criminal Procedure in a Nutshell (West)

7. Prosser, William, Handbook of the Law of Torts, 5th edition (West) 1984

8. Federal Rules of Civil Procedure and Evidence, Appellate Rules (West)

9. Prisoners' Self–Help Litigation Manual, ACLU

10. Local Rules of the Delaware District Court

11. Inmate Reference Manual for DCC

12. Any published rules or procedures available for inmate review applicable to MSU

13. Delaware State Bar Association, Delaware Basic Legal Forms 1984

### APPENDIX B

#### MSU LAW LIBRARY INVENTORY— 1989

1. U.S.Code Annotated: Title 18, Crime and Criminal Procedure (16 Volumes); Other subjects (8 Volumes)

2. Federal Civil Judicial Procedure and Rules (2 Volumes) 1986/89 edition

3. Federal Criminal Code and Rules 1986–89 edition

4. Corpus Juris Secundum: Bail/Bankruptcy 1–212 (1 Volume); Divorce 1–240 241–end (2 Volumes)

5. Federal Habeas Corpus, Sokol (1969 ed.)

6. Elements to Civil Procedure (Rosenberg, Weinstein)

7. Torts, 5th Ed. (Prosser, Keeton) (2 Volumes)

8. Uniform System of Citation

9. Local Rules of Civil Practice for the U.S. District Court, effective 1985

10. Inmate Reference Manual

11. Uniform Commercial Code

12. Executive Summary: Evaluation of Early Release Program

13. Encyclopedia Britannica Vols. 1–5, 8–16, 18, 19, 21, 22, 23

14. Delaware Code (Complete: Volumes 1–20)

15. Atlantic 2d: Volumes 350, 488–503 hardbound; Atlantic Supplements: Volumes 509, 511–527 (43 softback volumes)

16. Atlantic Digest (Volumes 6, 6A, 7, 10A, 16, 18, 19, 20, 22, 23, 27, 27A, 32)

17. Criminal Law in a Nutshell, Criminal Law, 23 Oct. 1989

18. Criminal Law in a Nutshell, Criminal Procedure Const. Limitation, Lafey, 23 Oct. 1989

APPENDIX C

MSU LAW LIBRARY INVENTORY—
JULY 1991

*AMERICAN JURISPRUDENCE 2d—
(1976)*
Volumes 1–82 w/pocket parts 1991
Table of Statutes, Rules & Regs., Cited
Desk Book
General Index 1989
General Index 1991
New Topic Service

*UNITED STATES SUPREME COURT DI-
GEST*—Lawyer's Edition (1982)
Volumes 1–22

*UNITED STATES SUPREME COURT
REPORTS*—Lawyer's Edition (1982)
67–101

*WHARTON'S CRIMINAL PROCE-
DURE*—(1990) 13th Edition
Volume 2 (two copies)

*WEST'S ATLANTIC DIGEST*—(1971)
Volumes 6, 6A, 7, 10A, 16, 18, 19, 20, 22,
23, 27, 27A, 32

*ATLANTIC REPORTER*—Hardbound
Volumes 350, 488, 489–503

*ATLANTIC REPORTER*—Advanced
Sheets
Volumes 509–528

*DELAWARE CODE ANNOTATED*
Volumes 1–20 (volume 8 missing) all
w/1990 Cum.Sup.

*FEDERAL CIVIL JUDICIAL PROCE-
DURE 7 RULES*—(1991 Ed.)

*FEDERAL CRIMINAL CODE &
RULES*—(1991 Ed.)

*FEDERAL SENTENCING GUIDELINES
MANUAL*—(1990 Ed.)

*BLACK'S LAW DICTIONARY*—(1979) 5th
Edition

*BENDER'S FORMS OF DISCOVERY*—
(1988)
Volumes 5, 5A, 12–16

*U.S.C.A.*—1984
Title 18
General Index 1990

*CORPUS JURIS SECUNDUM*—(1962)
Volumes 8, 27A, 27B

*PRISONER'S SELF–HELP LITIGATION
MANUAL*—(1991) 2d Edition

*ELEMENTS OF CIVIL PROCEDURE*—
(1976) 3rd Edition
Cases and Materials by Rosenberg, Wein-
stein, Smit & Korn

*THE LAW & PROCESS OF POST–CON-
VICTION REMEDIES*—(1982) by Robbins

*TORTS*—(1984) 5th Edition
Lawyer's Edition by Keeton, Dobbs, Kee-
ton & Owen
Student's Edition by Keeton, Dobbs, Kee-
ton & Owen

*UNIFORM COMMERCIAL CODE*—(1972)
by White, Summers

*DELAWARE BASIC LEGAL FORMS*

*CRIMINAL PROCEDURE IN A NUT-
SHELL*—(1988) 4th Edition

*CRIMINAL LAW IN A NUTSHELL*—
(1987) 2d Edition

*A UNIFORM SYSTEM OF CITATION*—
(1981) 13th Edition

*FEDERAL HABEAS CORPUS*—(1969) 2d
Edition by Sokol

*NATIONAL ZIP CODE DIRECTORY*—
(1991)

*LOCAL RULES U.S. DISTRICT COURT
FOR EASTERN DISTRICT OF PA.*

*LOCAL RULES U.S. DISTRICT COURT
FOR DISTRICT OF DELAWARE*

*U.S. COURT OF APPEALS I.O.P.*

## APPENDIX D

### MAIN LAW LIBRARY INVENTORY— JULY 1991

*REPORTERS:*
Atlantic Reporters, 2nd Series
Federal Reporters, 2nd Series
Federal Supplements
Delaware Reporters, 2nd Series
Delaware Law Monthly
Supreme Court Reporters
Federal Rules Decision Reporters

*DIGESTS:*
West Atlantic Digest, 2nd Series
West Federal Practice Digest, 2nd, 3rd and 4th Series
United States Supreme Court Digest

*CODES:*
Delaware Code Annotated, Title 1 through Title 31
Laws of Delaware, 1955 through 1983
United States Code Annotated
U.S.Code Congressional and Administrative News
District of Columbia Code
New Jersey Code Criminal Justice
Purdon's Pennsylvania Consolidated Statutes
West Virginia Code
Annotated Code of Maryland
Bankruptcy Code, Rules and Forms

*RULES:*
Delaware Superior Court Rules/Civil and Criminal
Delaware Supreme Court Rules/Lawyers Rules of Professional Conduct
Delaware Family Court Rules
Delaware Chancery Court Rules
Delaware Court of Common Pleas Rules/Civil and Criminal
Delaware Justice of the Peace Court Rules/Civil and Criminal
Federal Rules/Civil and Criminal
Federal Sentencing Guidelines

*FORMS:*
Moore's Manual Forms/Modern Legal Forms
West Federal Forms
Jones Legal Forms
Bender's Forms of Discovery

*ENCYCLOPEDIA:*
Corpus Juris Secundum
ALR, 3rd and 4th Series

*DICTIONARY:*
Bouvier's Law Dictionary
Black's Law Dictionary

*SHEPARDS:*
Shepards Atlantic Reporters Citations
Shepards Delaware Reporters Citations/Codes, Statutes, Rules
Shepards Federal Citations
Shepards Federal Rules Citations
Shepards Federal Supplement Citations
Shepards United States Citations

*OTHER BOOKS:*
Prisoners Self–Help Litigation Manual
Post–Conviction Remedies (Self Help Manual)
Wharton's Criminal and Civil Procedures
Class Actions Law and Practice
BNA Criminal Practice Manual
BNA The Family Law Reporter
BNA The United States Law Week
Martindale Hubble Law Directory
Ballentine's Law Dictionary
Attorney's Text Book of Medicine (Gordy–Gray)
Courtroom Medicine
Personal Injury (Scientific Automobile Accident Reconstruction ... Barzelay)